**Petition for Writ of Mandamus Granted and Opinion filed May 12, 2016.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-16-00114-CV

---

### IN RE ST. THOMAS HIGH SCHOOL, Relator

---

**ORIGINAL PROCEEDING**
**WRIT OF MANDAMUS**
**Co. Civil Ct at Law No 4**
**Harris County, Texas**
**Trial Court Cause No. 1072160**

---

## OPINION

A student and his parents sued a Catholic high school for breach of contract after the school expelled him. The school filed a plea to the jurisdiction invoking the ecclesiastical abstention doctrine, which the trial court denied. The school promptly sought a writ of mandamus from this court directing the trial court to (1)

vacate the order denying the jurisdictional plea, and (2) dismiss the suit. *See* Tex. Gov't Code Ann. § 22.221 (West 2004); *see also* Tex. R. App. P. 52.

We grant the school's petition for writ of mandamus because the trial court lacked subject matter jurisdiction to adjudicate this dispute.

## BACKGROUND

St. Thomas High School was founded in Houston in 1900 by the Congregation of St. Basil. This religious order is "an international community of religious priests" who "bind themselves to God by vows of poverty, chastity and obedience" and "have centered their apostolic work on the education of youth since 1822." St. Thomas operates under the laws of the Catholic Church to "nourish the faith of all of its members."

St. Thomas is not a church and is not owned by a church. It is a Roman Catholic college preparatory high school for young men attended by Catholics and non-Catholics alike.

St. Thomas furnished a Student-Parent Handbook to the student when he enrolled. The student and his parents signed an "Acknowledgement & Agreement Form" in which they acknowledged reviewing the handbook and agreed "to be bound by all of the terms, conditions, and disciplinary rules contained in the Handbook." The handbook contains this statement: "The legal status existing between the parent of the minor student and the private school is one of contract. The contract may be either verbal or written or a combination of both." The handbook also contains provisions addressing conduct by students and their

2

parents. The plaintiffs allege that the handbook is part of the contract governing their relationship with St. Thomas.

The student attended St. Thomas during the 2014-15 academic year. Before the 2015-16 academic year, plaintiffs again received a copy of the handbook. The parents reauthorized their signed "Acknowledgement & Agreement Form" online and paid tuition for the 2015-16 academic year.

A dispute developed during the fall 2015 semester between the student and a teacher regarding the student's test grades in a particular class. After discussions with the teacher failed to resolve the dispute, the student met with another St. Thomas faculty member about the problem. That meeting also failed to resolve the dispute.

Following these discussions, the student's parents sent a four-and-a-half-page, single-spaced letter to the principal and dean of students at St. Thomas on December 15, 2015. Among other things, this letter complains about (1) the quality of instruction and testing in the particular class and (2) the school's handling of the grade dispute. It asserts that the two faculty members in question violated the handbook and the school's mission to "embrace 'Teaching goodness, discipline and knowledge [in] the tradition of the Basilian Fathers and the sacred mission of St. Thomas.'"

The letter accuses the two faculty members of intimidating and harassing the student in response to legitimate concerns regarding testing procedures. The letter

also complains that the teacher ignored requests to call the parents and discuss the dispute. The letter states as follows:

> [The teacher] told my sixteen-year-old child that he did [not] call me because he was "too busy" preparing for a "romantic" night with his wife to "celebrate their wedding anniversary." By any reasonable standards in education or the Law, [the teacher] engaged in discussion with my child in a totally irrelevant, irresponsible and **sexually harassing** fashion. No student-Child should be subject to listening to his teacher's inadequate, <u>irrelevant, sexually demeaning</u> explanation for not returning his parent's request to receive a call from his teacher. My husband and I are very concerned that at [sic] teacher would engage our child student in such a personal and sexually demeaning discussion . . . .

(emphasis in original).

Another portion describes the letter's purpose as assisting the school "in **our common goal: the academic and spiritual education of my son**." (emphasis in original). The letter states that behaviors by these two faculty members "appear to suggest that they have absolutely no understanding of 'Teaching goodness, discipline and knowledge [in] the tradition of the Basilian Fathers and the sacred mission of St. Thomas.'" The letter asserts that the student is being harmed "both academically and spiritually." The letter concludes by demanding that St. Thomas form a panel of inquiry to investigate "willful abuses of power and harassment" aimed at the student.

St. Thomas administrators investigated the matter on December 17 and 18, 2015. An uncontroverted affidavit signed by St. Thomas's principal, Fr. Patrick Fulton, CSB, states as follows: "[What] happened was that [the student] asked [the

4

teacher] if he had called [the student's] mother as she requested in a note written on the bottom of [the student's] progress report the previous day. [The teacher] responded that he had not been able to call her the prior evening because it was his wedding anniversary." According to this affidavit, the student's father acknowledged to Fr. Fulton that the sexual harassment allegations were unfounded and should not have been included in the letter.

St. Thomas concluded that the December 15 letter violated the St. Thomas handbook provision addressing "Parent/Guardian Harassment." This provision states as follows:

> Under normal circumstances, a student will not be deprived of a Catholic education at St. Thomas High School on grounds relating to the attitude or behavior of parent(s)/guardians(s). Nevertheless, a situation could arise in which the uncooperative, defiant or disruptive attitude of a parent/guardian will so diminish the effectiveness of the school's endeavors to educate the student, so that continuation of the student's education would be greatly impaired. Such situations include, but are not limited to any statement, series of statements, action or actions by a parent/guardian or other person responsible for the student which upbraids, insults, threatens or abuses any teacher, administrator, coach or staff member of the school.

St. Thomas administrators decided that the parents' conduct warranted the student's expulsion. Fr. Fulton stated as follows in an affidavit: "Specifically, we determined that because of the highly-charged, slanderous accusations of sexual harassment against [the teacher], it would be difficult if not impossible for any St. Thomas teacher to be able to teach [the student] without fear of similar retribution by [the parents]." Fr. Fulton also stated: "[The student's] withdrawal was not based

in any manner on any academic issues that he was facing or any interactions that he had with teachers regarding academic issues."

On December 18, 2015, Fr. Fulton sent a letter to the parents disputing the sexual harassment allegation and announcing the student's expulsion. The expulsion occurred "as a result of [the] parents' false and defamatory sexual harassment allegations in the December 15, 2015 letter."

On January 5, 2016, St. Thomas delivered to plaintiffs' residence a check in an amount that would fully reimburse the parents for prepaid tuition for the spring 2016 semester. Plaintiffs refused to accept the check.

Plaintiffs filed suit on January 8, 2016. Their original petition alleges that St. Thomas breached the contract to educate their son when it expelled him and effectively seeks specific performance of the contract by requesting an injunction compelling St. Thomas to allow the student to attend classes. The plaintiffs' response to the petition for writ of mandamus states that they "are seeking to have STHS specifically perform under the agreement."

In support of their request for injunctive relief, plaintiffs allege that (1) their son has no adequate remedy at law because the rights involved are unique and irreplaceable; (2) a balancing of the equities favors the issuance of an injunction against St. Thomas forbidding it from denying the student an education at the school; and (3) their son will suffer irreparable injury unless he is allowed to attend classes at St. Thomas. The student filed a supporting affidavit stating: "I would like St. Thomas High School to fully fulfill their contract to educate me in the Roman

6

Catholic and tradition of the Basilian Fathers in which I have become accustomed." The student's mother filed a supporting affidavit stating: "It is almost impossible to put a value on good education and life lessons that one would learn in a private Catholic school."

The trial court held an ex parte hearing and signed a temporary restraining order on the same day suit was filed. Among other things, this order required St. Thomas to allow the student "to enter and attend classes" at St. Thomas and to refrain from (1) "communicating directly with [the student] in a threatening, annoying, or harassing manner"; (2) "communicating a threat through any person to [the student]"; and (3) "engaging in conduct directed specifically toward [the student] that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass Plaintiff." The trial court signed an order extending the temporary restraining order on January 21, 2016; this order contained the same requirements and prohibitions as the original temporary restraining order signed on January 8.

St. Thomas filed its original answer and plea to the jurisdiction on January 28, 2016, asserting that the trial court lacked subject matter jurisdiction based on the First Amendment to the United States Constitution and the ecclesiastical abstention doctrine. The trial court denied the plea to the jurisdiction on February 2, 2016.

The trial court signed a temporary injunction on February 3, 2016. The temporary injunction directs St. Thomas to "allow [the student] to enter and attend classes at St. Thomas . . . for the remainder of the Spring 2016 semester which

7

concludes May 27, 2016." It also orders St. Thomas "to treat [the student] in the same manner as any other student attending St. Thomas High School."

St. Thomas now seeks appellate review via mandamus.

## ANALYSIS

St. Thomas and the plaintiffs characterize this dispute's nature in sharply different terms.

According to St. Thomas, the trial court lacked subject matter jurisdiction to adjudicate this dispute. St. Thomas argues that First Amendment protections giving rise to the ecclesiastical abstention doctrine place limits on a civil court's subject matter jurisdiction to litigate a Catholic high school's doctrines, membership, discipline, and internal affairs – just as limits exist on civil court jurisdiction to address litigation involving churches. St. Thomas further argues that civil court jurisdiction cannot impinge on St. Thomas's right to manage its internal admission policies consistent with its religious practices and beliefs. Accordingly, St. Thomas contends that the trial court abused its discretion by failing to apply the ecclesiastical abstention doctrine and denying its plea to the jurisdiction.

The student and his parents contend that First Amendment limits on civil court jurisdiction do not apply here because St. Thomas is not a church; it is a college preparatory high school that admits both Catholic and non-Catholic students. They portray this as a purely commercial dispute based on St. Thomas's breach of a contractual obligation to provide education promised in exchange for tuition paid. They further contend that their lawsuit does not implicate First

8

Amendment protections for religious doctrine, religious discipline, or theological teaching.

We must evaluate these contentions in light of the procedural posture in which this case is presented. This case reaches the appellate court as a mandamus arising from the denial of a plea to the jurisdiction and an accompanying temporary injunction.

Mandamus is warranted when the relator demonstrates a clear abuse of discretion and the lack of an adequate by appeal. *In re Prudential Ins. Co*., 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding). "A trial court has no discretion and must dismiss the case as a ministerial act when it lacks subject matter jurisdiction." *In re Am. Nat In re Am. Nat'l Cty Mut. Ins. Co.*, No. 14-12-01136-CV, 2013 WL 476824 at *1 (Tex. App.—Houston [14th Dist.] Feb. 6, 2013, orig. proceeding) (per curiam) (mem. op.). Mandamus is an appropriate remedy when the trial court acts without subject matter jurisdiction. *Id*. at *1–2; *see also In re Crawford & Co.*, 458 S.W.3d 920, 929 (Tex. 2015) (per curiam); *In re John G. and Marie Stella Kenedy Memorial Foundation,* 315 S.W.3d 519, 522 (Tex. 2010).

"Lack of jurisdiction may be raised by a plea to the jurisdiction when religious-liberty grounds form the basis for the jurisdictional challenge." *Westbrook v. Penley*, 231 S.W.3d 389, 394 (Tex. 2007). We review a trial court's ruling on a plea questioning the trial court's subject-matter jurisdiction *de novo*. *Id*. "A plea should not be granted if a fact issue is presented as to the court's jurisdiction, but if the pleadings affirmatively demonstrate an incurable jurisdictional defect, then the plea to the jurisdiction must be granted." *Id*. When the relevant evidence is undisputed or fails to

present a jurisdictional fact issue, we must rule on the plea as a matter of law. *Shannon v. Mem'l Drive Presbyterian Church U.S.*, 476 S.W.3d 612, 620 (Tex. App.—Houston [14th Dist.] 2015, pet. filed).

With these standards as a backdrop, we now turn to the ecclesiastical abstention doctrine and its application here. The parties have identified no material fact disputes in this record concerning the threshold jurisdictional question presented to us. Their disagreement focuses instead on the jurisdictional implications of undisputed facts.

## I. Legal Standards Under the Ecclesiastical Abstention Doctrine

The First Amendment of the United States Constitution provides: "Congress shall make no law respecting an establishment of Religion, or prohibiting the free exercise thereof." U.S. const. amend. I, XIV. "The First Amendment is applicable to the states through the Fourteenth Amendment." *Masterson v. The Diocese of Nw. Tex.*, 422 S.W.3d 594, 601 (Tex. 2013) (citing *Cantwell v. Connecticut*, 301 U.S. 296, 303 (1940)).

"This provision forbids the government from interfering with the rights of hierarchical religious bodies to either establish their own internal rules and regulations or create tribunals for adjudicating disputes over religious matters." *Shannon*, 476 S.W.3d at 621 (citing *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708–09 (1976)). "Government action is not permitted to interfere with the free exercise of religion by encroaching on a religious institution's ability to manage its internal affairs." *Id.* "Although wrongs may exist in the ecclesiastical setting, and although the administration of the church may be inadequate to provide a remedy, the preservation

10

of the free exercise of religion is deemed so important a principle it overshadows the inequities that may result from its liberal application." *Id.*; *see also Serbian E. Orthodox Diocese*, 426 U.S. at 713–14 (civil courts cannot delve into matters focusing on "'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of a church to the standard of morals required of them.'") (quoting *Watson v Jones*, 80 U.S. (13 Wall.) 679, 733 (1872)). "To enforce this constitutional provision, Texas courts have utilized the 'ecclesiastical abstention doctrine.'" *Shannon*, 476 S.W.3d at 621; *see also Masterson*, 422 S.W.3d at 601.

This doctrine does not foreclose civil court subject matter jurisdiction over all disputes involving religious entities. Because churches, their congregations, and their hierarchies exist and function within the civil community, they are amenable to rules governing civil, contract, and property rights in appropriate circumstances. *Id.* at 622.

The United States Supreme Court has recognized an exception to the doctrine of church autonomy when neutral principles of law may be applied to resolve disputes over ownership of church property so long as the resolution of ownership entails no inquiry into religious doctrine and the interpretation of the instruments of ownership would not require the court's resolution of a religious controversy. *C.L. Westbrook, Jr. v. Penley*, 231 S.W.3d 389, 398 (Tex. 2007). The Texas Supreme Court has not yet applied this exception in circumstances other than property ownership disputes. *See id.* at 399 ("But even if we were to expand the neutral-principles approach beyond the property-ownership context as Penley requests, we disagree that free-exercise concerns would not be implicated.").

11

This court and others have recognized that the neutral principles exception potentially is applicable to claims not involving property disputes. *See, e.g., Shannon*, 476 S.W.3d at 622, 624–25; *Thiagarajan v. Tadepalli*, 430 S.W.3d 589, 594 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *Hamashiach v. Adan*, 14-13-00491-CV, 2015 WL 971217, at \*7 (Tex. App.—Houston [14th Dist.] Mar. 3, 2015, no pet) (mem. op.); *see also In re Hoa Hao Buddhist Congregational Church Texas Chapter*, 01-14-00059-CV, 2014 WL 7335188, at \*3–4 (Tex. App.—Houston [1st Dist.] Dec. 23, 2014, orig. proceeding) (per curiam) (mem. op.); *Anderson v. Truelove*, 446 S.W.3d 87, 93–94 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

"Determining the reach of subject matter jurisdiction in disputes involving religious organizations requires consideration of competing demands." *Thiagarajan*, 430 S.W.3d at 594. "'Courts do not have jurisdiction to decide questions of an ecclesiastical or inherently religious nature, so as to those questions they must defer to decisions of appropriate ecclesiastical decision makers.'" *Thiagarajan*, 430 S.W.3d at 594 (quoting *Masterson*, 422 S.W.3d at 605–06). "'But Texas courts are bound to exercise jurisdiction vested in them by the Texas Constitution and cannot delegate their judicial prerogative when jurisdiction exists.'" *Id.* at 594–95 (quoting *Masterson*, 422 S.W.3d at 606). "Properly exercising jurisdiction requires courts to apply neutral principles of law to non-ecclesiastical issues involving religious entities in the same manner as they apply those principles to other entities and issues." *Id.* at 595 (quoting *Masterson*, 422 S.W.3d at 606).

12

"In short, courts must act but cannot intrude." *Id*. at 595. "As the Texas Supreme Court has recognized, the line between required judicial action and forbidden judicial intrusion 'will not always be distinct' because many disputes 'require courts to analyze church documents and organizational structures to some degree.'" *Thiagarajan*, 430 S.W.3d at 595 (quoting *Masterson*, 422 S.W.3d at 606).

"In determining whether the ecclesiastical abstention doctrine applies, courts must analyze whether a particular dispute is 'ecclesiastical' or simply a civil law controversy in which church officials happen to be involved." *Shannon*, 476 S.W.3d at 622. "To resolve this issue, courts must look to the substance and effect of a plaintiff's complaint to determine its ecclesiastical implication." *Id*.

Applying these standards, this court has addressed a wide variety of disputes involving religious organizations.

Some disputes fall outside the reach of civil court jurisdiction based on the ecclesiastical abstention doctrine. *See, e.g., Hamashiach*, 2015 WL 971217, at *7 (dismissing disability discrimination claim based on temporary ban of plaintiff for conduct contrary to synagogue's religious beliefs); *Thiagarajan*, 430 S.W.3d at 595 (dismissing defamation and indemnity claims arising from emails among leaders of Hindu temple predicated on disagreement regarding religious standards for conduct); *Williams v. Gleason*, 26 S.W.3d 54, 58 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (dismissing tort claims arising from actions taken by church elders to discipline plaintiffs for conduct contrary to church beliefs).

Other disputes are amenable to resolution within the civil court system. *See, e.g., Shannon*, 476 S.W.3d at 619 (trial court had jurisdiction over contract and tort

13

claims asserted by former church employee, which arose from alleged breach of settlement agreement containing non-disparagement clause); *Lacy v. Bassett*, 132 S.W.3d 119 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (trial court had jurisdiction over church member's suit against church to obtain access to financial records pursuant to Texas Non-Profit Corporation Act).

We now apply these general principles to the specific legal dispute arising from St. Thomas's expulsion of this student.

## II.    Application of Standards

As framed by the parties' briefing, determining the ecclesiastical abstention doctrine's reach in this case involves consideration of two primary issues. The first is whether the doctrine applies to a Catholic high school that is neither a church nor owned by a church. The second is whether the doctrine applies to the particular dispute that arose at this Catholic high school.

We address these issues in turn.

### A. The Ecclesiastical Abstention Doctrine Applies to St. Thomas High School.

We reject the plaintiffs' contention that the ecclesiastical abstention doctrine does not apply to St. Thomas because it is a school rather than a church. To be sure, not every entity featuring the word "saint" in its name brings a religious focus to its activities. On this record, however, St. Thomas's religious focus is undisputed and significant.

14

"Catholic schools are 'a powerful vehicle for transmitting the Catholic faith to the next generation,' and 'parochial schools involve substantial religious activity and purpose.'" *In re Vida,* No. 04–14–00636–CV, 2015 WL 82717, at *3 (Tex. App.—San Antonio Jan. 7, 2015, orig. proceeding) (mem. op.) (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 616 (1971)). The uncontroverted mandamus record demonstrates that this is true of St. Thomas. The Mission Statement of St. Thomas states: "Teaching goodness, discipline and knowledge is the tradition of the Basilian Fathers and the sacred mission of St. Thomas, a Catholic college preparatory high school." All students must attend Mass, monthly school liturgies, and other special church celebrations throughout the school year. The school's goal is that every graduate of St. Thomas is a spiritual young man who embodies Christian values in a Catholic tradition, integrates Christian morality into all aspects of his life, and participates actively in a faith community.

Courts within Texas have applied the ecclesiastical abstention doctrine to dismiss suits against religious schools or officials with authority over religious schools. *See In re Vida*, 2015 WL 82717, at *2–3 (dismissing negligence suit against superintendent of the Diocese of Laredo Catholic Schools arising from denial of student's admission to a Catholic school); *Becker v. Clardy*, No. 03-10-00376-CV, 2011 WL 6756999, at *1 (Tex. App.—Austin Dec. 22, 2011, pet. denied) (mem. op.) (dismissing defamation suit by a former teacher against Catholic school); *Patterson v. Sw. Baptist Theological Seminary*, 858 S.W.2d 602, 605–06 (Tex. App.—Fort Worth 1993, no writ) (dismissing wrongful termination suit against

15

Baptist seminary that was not owned or operated by a church); *Klouda v. Sw. Baptist Theological Seminary*, 543 F. Supp. 2d 594, 611 (N.D. Tex. 2008) (same).

Following this authority and on this record, we conclude that St. Thomas's status as a Catholic high school does not place it outside the ecclesiastical abstention doctrine's reach. No less than a Catholic church, St. Thomas is a religious institution enjoying First Amendment protection for the free exercise of religion.

This conclusion does not end the inquiry here because civil court jurisdiction can exist even when a religious institution is litigating.

**B. The Ecclesiastical Abstention Doctrine Applies to This Dispute.**

Plaintiffs assert that the ecclesiastical abstention doctrine does not apply here because resolution of this dispute will not require a civil court to intervene in clergy hiring, firing, or discipline; address standards of morality; interpret any church constitution, by-laws, or other governing document; or address matters relating to a church's congregational or hierarchical nature.

Plaintiffs contend they ask the trial court only to apply neutral legal principles to a contract dispute arising from St. Thomas's refusal to provide the education for which they already have paid. Plaintiffs point to *Shannon* for the proposition that contracts entered into by religious organizations can be interpreted in purely secular terms when reliance on religious precepts is not required. *See Shannon*, 476 S.W.3d at 624.

16

*Shannon* is distinguishable because the claims in that case did not encroach on a religious entity's ability to manage its internal affairs or a decision to expel a church member. Rather, the claims arose from the church's alleged breach of the non-disparagement clause contained in a settlement agreement with a former employee; the church and the former employee entered into the settlement agreement after the former employee alleged that she was fired in retaliation for accusing a church elder of sexual harassment. *Id.* at 618. According to the former employee, the church violated this non-disparagement clause when it discussed her departure with a subsequent employer in another city resulting in loss of her job. *Id*. at 618–19.

More fundamentally, plaintiffs' exclusive focus on the presence or absence of an express dispute concerning religious doctrine demonstrates an unduly narrow conception of the applicable protections.

Government action may burden the free exercise of religion not only by interfering with an individual's observance or practice of a particular faith, but also by encroaching on a religious entity's ability to manage internal affairs. *Westbrook,* 231 S.W.3d at 395. "Accordingly, the autonomy of a church in managing its affairs and deciding matters of 'church discipline . . . or the conformity of the members of the church to the standard of morals required of them' has long been afforded broad constitutional protection." *Id*. at 397. "Courts have no jurisdiction to 'revise or question ordinary acts of church discipline' and 'cannot decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or

17

irregularly cut off from the body of the church.'" *Id.* at 399 (quoting *Minton v. Leavell*, 297 S.W. 615, 621–22 (Tex. Civ. App.—Galveston 1927, writ ref'd)).

Texas courts have applied the ecclesiastical abstention doctrine to dismiss suits that unduly encroach on a religious entity's right to manage its own internal affairs in several different situations.

In *Westbrook*, the defendant was a pastor and licensed professional counselor who directed his congregation to shun the plaintiff based on information disclosed to the pastor-counselor during a counseling session. *Id.* at 393. Penley argued that her professional-negligence claim could be resolved under neutral tort principles without resorting to or infringing upon religious doctrine. *Id.* at 399. The Texas Supreme Court disagreed, stating:

> A church's decision to discipline members for conduct considered outside of the church's moral code is an inherently religious function with which civil courts should not generally interfere. *See Watson*, 80 U.S. (13 Wall.) at 727. Courts have no jurisdiction to "revise or question ordinary acts of church discipline" and "cannot decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly cut off from the body of the church." *Id*. at 730.
> . . .
>
> In sum, while the elements of Penley's professional-negligence claim can be defined by neutral principles without regard to religion, the application of those principles to impose civil tort liability on Westbrook would impinge upon CrossLand's ability to manage its internal affairs and hinder adherence to the church disciplinary process that its constitution requires.

*Id.*

18

Similarly, in *Hamashiach*, 2015 WL 971217, at \*7, the plaintiff argued that subject matter jurisdiction existed because the defendant synagogue impermissibly banned her from services due to a physical disability. This court rejected the plaintiff's contention because the dispute could not be adjudicated without delving into the synagogue's discipline of a member:

> Adan's claim does not merely touch on religious conduct; rather, Adan's claim is intertwined with and arises out of Beth Yeshua's decision to ban her from synagogue, which is an inherently religious function. Whether Beth Yeshua's explanation that this religious discipline was issued because of Adan's use of scriptural accusations against Pastor Jeter was genuine, or whether Adan was disciplined for asserting her rights as a disabled person, is a question the trial court cannot determine without inserting itself into internal matters of the synagogue's discipline.

*Id*. at \*7.

More directly on point is *In re Vida*, 2015 WL 82717, at \*2–4. In that case, the parents of a kindergartner sought a court order compelling Mary Help of Christians School, a Catholic school located within the Diocese of Laredo, to admit their daughter to first grade even though she did not meet the school's age requirements. *Id.* at \*1. The parents sued the school, the institute that owned and operated the School, and Rosa Vida (the superintendent of the Diocese of Laredo Catholic Schools), alleging that Vida negligently misconstrued state law regarding school age admission requirements. *Id*. Vida filed a plea to the jurisdiction asserting that the ecclesiastical abstention doctrine precluded the trial court from exercising jurisdiction over the claims against her. *Id*. The trial court denied Vida's plea, and she filed a petition for writ of mandamus challenging the trial court's ruling. *Id*.

The parents argued that their claims raised no questions concerning religious doctrine or church governance because the age requirement contained in the Diocese's policy manual was a purely secular policy based on a misinterpretation of state law. *Id.* at *2. The court of appeals disagreed, holding that the ecclesiastical abstention doctrine precluded subject matter jurisdiction because the suit "delves into the Diocese's governance of its internal affairs." *Id.* at *3.

The court of appeals reasoned that just as courts lack jurisdiction to question admission requirements for Catholic churches, they also lack jurisdiction to consider claims arising from the admission requirements of a Catholic school because such claims would impinge on the Diocese's ability to manage its internal affairs:

> [E]ven if the School's age requirement was not required by Texas law, imposing civil tort liability on the superintendent of Catholic schools for enforcing a policy that established an age requirement would impinge upon the Diocese's ability to manage its internal affairs by adopting policies regarding admission requirements for Catholic schools.

> Finally, the Texas Supreme Court has stated, "Membership in a church creates a different relationship from that which exists in other voluntary societies. . . . Church relationship stands upon a different and higher plane, and the right of a church to decide for itself whom it may admit into fellowship . . . cannot be questioned by the courts, when no civil or property rights are involved." *Id.* at 398 (internal citations omitted). Catholic schools are "a powerful vehicle for transmitting the Catholic faith to the next generation," and "parochial schools involve substantial religious activity and purpose." *Lemon v. Kurtzman*, 403 U.S. 602, 616 (1971). Just as the courts cannot question the admission requirements for Catholic churches, they also do not have jurisdiction to consider a claim arising from the admission

20

requirements for Catholic schools which "are subject to the authority of the Church" under Canon Law.

*Id*. at *2–3.

Similar reasoning was employed in *Dlaikan v. Roodbeen*, 206 Mich. App. 591, 593-94, 522 N.W.2d 719, 720 (1994), in which three families sued a Catholic school for breach of contract after their children were denied admission because of alleged disciplinary problems.

The Michigan Court of Appeals held that review of the defendant school's admission decision fell outside the jurisdiction of civil courts, explaining: "When the claim involves the provision of the very services (or as here refusal to provide these services) for which the organization enjoys First Amendment protection, then any claimed contract for such services likely involves its ecclesiastical policies, outside the purview of civil law." *Id.* at 593. "In this regard there can be no distinction between a church providing a liturgical service in its sanctuary and providing education imbued with its religious doctrine in its parochial school." *Id.* "A civil court should avoid foray into a 'property dispute' regarding admission to a church's religious or educational activities, the essence of its constitutionality protected function. To do so is to set foot on the proverbial slippery slope toward entanglement in matters of doctrine or ecclesiastical polity." *Id*. at 593 (citation omitted).

The court explained that some activity by an ecclesiastical organization may be governed by civil law alone, such as entering into a contract to buy or sell property or interact in some other way with the secular world. *Id.* at 593–94. However, the court held that the plaintiff's claims regarding the denial of admission to the school were "so

21

entangled in questions of religious doctrine or ecclesiastical polity that the civil courts lack jurisdiction to hear them." *Id.* at 594.

Other courts also have applied the ecclesiastical abstention doctrine to dismiss claims arising from a Catholic school's decision to expel or decline admission to a student.[1]

The principles discussed in *Westbrook, Hamashiach*, *Vida*, and *Dlaikan* apply with equal force to this dispute and confirm that civil court jurisdiction is foreclosed under the ecclesiastical abstention doctrine.

As a threshold matter, plaintiffs overreach when they characterize their suit as a purely "commercial dispute regarding an agreement for [St. Thomas] to prepare [the student] for college." This characterization is an overreach because

---

[1] *See Winkler ex rel. Winkler v. Marist Fathers of Detroit, Inc.,* 323511, 2015 WL 7079054, at *2–3 (Mich. Ct. App. Nov. 12, 2015) (applying *Dlaikan* to dismiss a claim by a student denied admission to a Catholic high school alleging discrimination under the Persons with Disabilities Civil Rights Act). In *Gaston v. Diocese of Allentown*, 712 A.2d 757, 757–58 (Pa. Super. Ct. 1998), the court held that it lacked jurisdiction of claims by the families of two students who were expelled by a private Catholic elementary school. The court reasoned: "The parochial school, synonymous with the installation of dogma and discipline in its students, is an integral part of the Roman Catholic Church. The school is a repository for Catholic tradition and scripture; it is so intertwined with the church doctrine that separation is neither pragmatic nor possible. Intrusion into the bishop's decision on matters concerning parochial school discipline and expulsion places this court perilously close to trespassing on sacred ground." *Id.* at 758. Similarly, in *Askew v. Trustees of Gen. Assembly of Church of Lord Jesus Christ of Apostolic Faith, Inc.*, 644 F. Supp. 2d 584, 595 n.8 (E.D. Pa. 2009), the court recognized: "A school's decision to expel a student is akin to a church's decision to remove or discipline one of its members. The decision necessarily involves doctrinal criteria, and attempting to disentangle the doctrinal from the secular in this context is precisely what the *Watson–Gonzalez–Milivojevich* rule prohibits. In the parochial school context, unlike most other intrachurch property dispute cases, we know from the outset that such doctrinal questions are necessarily at the core of a school's decision to expel."

spiritual standards and references to Catholic teaching permeate the December 15 letter that led to expulsion. The letter accuses two faculty members of violating "St. Thomas High School's mission statement, which states clearly that all members of the school – students as well as faculty and staff – should endeavor to embrace 'Teaching goodness, discipline and knowledge [in] the tradition of the Basilian Father and the sacred mission of St. Thomas.'" The letter further states that its purpose is "to assist you in our **common goal: the academic and spiritual education of my son**." (original emphasis). The letter asserts that the behavior of the teacher is harming the student "both academically and spiritually."

Spiritual standards also are reflected in plaintiffs' original petition, which states: "If parents cannot freely express the issues to STHS, then its endeavor to teach 'goodness, discipline, and knowledge' is more imagined than real." The student filed an affidavit in support of the petition stating: "I would like St. Thomas High School to fully fulfill their contract to educate me in the Roman Catholic and tradition of the Basilian Fathers in which I have become accustomed." The student's mother filed a supporting affidavit stating: "It is almost impossible to put a value on good education and life lessons that one would learn in a private Catholic school."

This record belies any contention that spiritual standards and religious doctrine play no role in the parties' dispute. Plaintiffs expressly relied on the Catholic nature of a St. Thomas education to justify their demands for specific performance and immediate injunctive relief.

In addition to express references to spiritual standards and Catholic teaching, this record also demonstrates impermissible interference with St. Thomas's management of its internal affairs and encroachment upon its internal governance.

St. Thomas expelled the student after determining that his parents violated the Student-Parent Handbook by falsely accusing a teacher of sexual harassment. Plaintiffs sued for specific performance; they obtained a temporary injunction overruling the expulsion and compelling St. Thomas to allow the student's attendance. This injunction impedes St. Thomas's ability to manage its internal affairs regarding discipline and expulsion.

The interference here is not limited solely to the decision regarding admission or expulsion of a particular student. The temporary injunction directs St. Thomas "to treat [the student] in the same manner as any other student attending St. Thomas High School." Broad and open-ended injunctive relief of this nature implicates all aspects of St. Thomas's mission and operations. The temporary injunction further directs that "future communications between the parties with respect to academic matters concerning [the student] shall be restricted to [the student's father] and Father Patrick Fulton. Father Fulton may refer [the student's father] to appropriate faculty and staff as necessary."[2]

---

[2] The temporary injunction replaced earlier temporary restraining orders requiring St. Thomas to allow the student "to enter and attend classes" at St. Thomas and to refrain from (1) "communicating directly with [the student] in a threatening, annoying, or harassing manner"; (2) "communicating a threat through any person to [the student]"; and (3) "engaging in conduct directed specifically toward [the student] that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass Plaintiff."

According to *In re Vida*, a key inquiry is this: "If judicial resolution of the claim will interfere with a church's management of its internal affairs or encroach on upon the church's internal governance, the court may not exercise jurisdiction over the claim." *In re Vida*, 2015 WL 82717, at *2. Impermissible interference and encroachment are not merely prospective or hypothetical on this record. These consequences presently are occurring under the trial court's temporary injunction.

Therefore, we conclude that (1) the ecclesiastical abstention doctrine applies here based on the undisputed facts; and (2) the trial court abused its discretion by denying St. Thomas's plea to the jurisdiction.

## III. Mandamus is Warranted

The trial court's abuse of discretion appropriately can be remedied via mandamus.

"Mandamus is generally proper if a trial court lacks subject matter jurisdiction over the underlying proceeding, and in such a case, a relator need not establish that she lacks an adequate remedy by appeal." *In re Footman*, 03-15-00477-CV, 2015 WL 7164170, at *2 n.1 (Tex. App.—Austin Nov. 10, 2015, orig. proceeding) (mem. op.) (citing *In re Martinez*, 450 S.W.3d 157, 161 (Tex. App.—San Antonio 2014, orig. proceeding)).

Further, St. Thomas lacks an adequate remedy by appeal for the ongoing violation of its First Amendment rights. "[A]ppeal is often inadequate to protect the rights of religious organizations when there are important issues relating to the constitutional protections afforded by the First Amendment." *In re Godwin*, 293

S.W.3d 742, 747 (Tex. App.—San Antonio 2009, no pet.) (citing *Tilton v. Marshall*, 925 S.W.2d 672, 682 (Tex. 1996)); *see also Republican Party of Texas v. Dietz*, 940 S.W.2d 86, 94 (Tex. 1997) ("mandamus jurisdiction may be properly invoked when First Amendment rights are at issue"). In *In re Vida*, 2015 WL 82717, at \*3, the court of appeals held that an appeal would not adequately protect the important First Amendment rights at issue relating to the free exercise of religion. Because these circumstances also are present here, St. Thomas is entitled to mandamus relief.

## CONCLUSION

We conclude that St. Thomas is entitled to a writ of mandamus because the trial court lacked subject matter jurisdiction over this dispute. We direct the trial court to (1) vacate the order denying St. Thomas's plea to the jurisdiction and (2) dismiss the cause for lack of jurisdiction. We deny the pending motion for stay as moot.

We are confident that the trial court will act in accordance with this opinion. The writ will issue only if the trial judge fails to do so.


/s/    William J. Boyce
       Justice


Panel consists of Justices Boyce, Jamison, and Brown.

26