CONDITIONALLY GRANTED and Opinion Filed August 30, 2019



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-01533-CV

## IN RE FIRST CHRISTIAN METHODIST EVANGELISTIC CHURCH, Relator

**Original Proceeding from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-11718**

## MEMORANDUM OPINION

Before Justices Schenck, Partida-Kipness, and Reichek
Opinion by Justice Reichek

The underlying proceeding involves a church's termination of its senior pastor. In this original proceeding, relator First Christian Methodist Evangelistic Church ("the Church" or relator) seeks a writ of mandamus directing the trial court to vacate its order denying the Church's plea to the jurisdiction and to grant the plea and dismiss the case. After reviewing the Church's petition, the real party in interest's response, the Church's reply, and the mandamus record, we conclude the Church is entitled to the relief requested because the ecclesiastical abstention doctrine applies as a matter of law to the facts of this case and, as such, the trial court abused its discretion by denying the plea to the jurisdiction.

### Background

In August 2018, the Church terminated its Senior Pastor, John Wilson III ("the Senior Pastor"). The Senior Pastor filed suit against the Church and three church board members for breach of contract and specific performance, alleging that the Church terminated him without

cause and failed to pay him severance that he contends was required to be paid under his employment contract.

The Church and board members filed a plea to the jurisdiction. They argued that the Senior Pastor was terminated pursuant to church policies and procedures and was not entitled to severance pay because the termination was based on a finding of moral misconduct. The Church maintains that the Senior Pastor's position is inherently religious, and that his employment contract is subject to the laws and bylaws of the Church, which the Church asserts are "codified" in the Church's Book of Discipline. The Book of Discipline sets forth "the laws, plans, polity and processes by which [the Church] governs itself and remains consistent" and "reflects [the Church's] understanding of the Church and expectations of its laity and clergy . . . ." The Book of Discipline contains the Church Bylaws. According to the Church, to interpret the employment contract, the fact-finder must interpret the Church's Book of Discipline and the Church Bylaws. Further, the Church argues that the severance provisions of the employment contract are conditioned upon whether the Senior Pastor is terminated for moral misconduct. As such, the determination of whether the Senior Pastor is entitled to severance under the contract requires an analysis of the Church's moral principles, which are set out in the Church's Book of Discipline, and a review of how the Church manages its internal affairs.

The Church also argues that the trial court lacked jurisdiction over the Senior Pastor's case because the decision to terminate the Senior Pastor involved ecclesiastical matters and concerns issues into which a trial court may not delve. For example, pursuant to the laws of the Church, employment decisions concerning the Senior Pastor are restricted to a vote by the Church Conference. Only members in good standing may vote to terminate in the Church Conference, and the qualification of good standing is inherently religious pursuant to criteria set in the Church's Book of Discipline. Membership qualifications include being baptized and promising to live a

Christian life, to always remain faithful members of Christ's holy Church, to be loyal to the Church, and to uphold the Church "by their prayers, their presence, their gifts, and their service." According to the Church, any claims surrounding the Senior Pastor's employment are "not purely secular" and, therefore, the lawsuit must be dismissed pursuant to the ecclesiastical abstention doctrine. The Church presented evidence that the Church Conference voted to terminate the Senior Pastor's employment "consistent with the internal policies and procedures of the Church." Similarly, the Church argues that the question of severance pay is a determination of a minister's salary and is also an effort by the Senior Pastor to right an alleged wrong related to the firing or administration of clergy, both of which are meant to be decided outside of the secular court system. Finally, the Church maintains that the ecclesiastical abstention doctrine applies to this case because the termination of the Senior Pastor involves the Church's decisions in managing its affairs. The Church contends that the plea to the jurisdiction should have been granted under the ecclesiastical abstention doctrine and the ministerial exception.

In contrast, the Senior Pastor maintains that the underlying case is merely a contract dispute that can be decided under neutral legal principles. He asserts that the only questions to be answered are whether there was a valid employment contract, the terms of that contract, and whether the Church breached those terms by failing to pay him six months' severance. Specifically, he argues that section 5.4 of his employment contract required the Church to pay him six months' severance if the Church terminated him unilaterally without cause upon a vote of the Church Conference:

> 5.4 Unilateral Termination. The Pastor does hereby agree that the Church Conference may unilaterally terminate this Agreement, without cause, by a majority vote of ¾ the church member's congregation voting at Church Conference. Voting members must be in good standing with the church; i.e. actively involved in the church as it relates to tithes and offering as well as in attendance. In the event of a unilateral termination by the Church Conference, the Church Conference does hereby agree to pay the Pastor a six (6) months' severance pay. The Church Conference does hereby agree that the Pastor may unilaterally terminate this Agreement provided he gives the Church Conference two weeks' notice of his intention to terminate.

The Senior Pastor maintains that the Church's August 14, 2018 termination letter established that his termination was a unilateral termination made at the "will" of the Church Conference and, as such, fell under section 5.4 as a matter of contract law:

*"Sharing the good news of Jesus Christ."* (Matt. 28:19-20)

August 14, 2018

Rev. John W. Wilson
120 Steel Dust Drive
Red Oak, TX 75154

Dear Rev. Wilson,

According to the Church Conference will on August 13, 2018, it was approved to terminate your employment with two weeks' pay effective immediately.

You will receive your check via direct deposit on August 15th and the final check August 31st unless you stipulate otherwise. Your pay stubs will be mailed to you.

Two keys were left in your office; however, additional keys were assigned to you and all keys should be returned.

We wish you and your family all the best going forward.

Sincerely,

Officers and Members of First CME Church

The Senior Pastor argues that the trial court did not need to review church doctrine or policies to determine if the termination was a unilateral termination without cause that required the Church to pay him six months' severance pay. The Senior Pastor also argues that section 5.3 of the contract required the Church to give him a reasonable opportunity to remedy any incompetence or inefficiency before he could be terminated for misconduct.

> 5.3 Dismissal for Misconduct. The Church Conference may dismiss the Pastor during the term of the Agreement for misconduct connected with the work. Termination for misconduct shall immediately render the terms of this employment agreement null and void. "Misconduct" is defined as follows: (a) Failure to fulfill duties or responsibilities as set forth under the terms and conditions of this Agreement; (b) Incompetence or inefficiency in the performance of required or assigned duties as documented by evaluations, memoranda, or other written communication from the Church Conference; provided, however, the terms and conditions of this paragraph shall not constitute misconduct unless the Church Conference has provided the Pastor a reasonable opportunity to remedy any incompetency or inefficiency; (c) Insubordination or refusal to comply with lawful written Church Conference directives; (d) Failure to comply with the church policy or administrative regulations; (e) Neglect of duties; (f) Convicted of driving while intoxicated; (g) Illegal use of drugs, hallucinogens, or other substances regulated by the Texas Controlled Substances Act; (h) Disability, not otherwise protected by law, that impairs performance of the required duties of the Pastor; (i) Immorality, which is conduct the Church Conference deems, is not in conformity with the accepted moral standards of the Church. Immorality is not confined to sexual matters, but includes conduct inconsistent with rectitude or indicative of corruption, indecency or depravity; (j) Assault on an employee, student or church member; (k) Knowingly falsifying records or documents related to the Church's business; (l) Conscious misrepresentation of material facts to the Church Conference or the church officials in the conduct of the church's business; (m) Failure to promptly notify Church Conference of arrest or indictment for any felony or misdemeanor involving moral turpitude; (n) Failure to disclose to any prior felony conviction or misdemeanor conviction of moral turpitude, whether or not such conviction was subsequently removed by probation or deferred adjudication. (o) Any other reason constituting "misconduct" under Texas law.

He maintains that the trial court can determine if he was given an opportunity to cure without reviewing the book of discipline, church bylaws, or any biblical principles and without making any assessment of misconduct.

The trial court granted the board members' plea to the jurisdiction and dismissed the board members from the lawsuit. But the trial court denied the Church's plea without prejudice and authorized jurisdictional discovery concerning the formation and creation of the employment contract, whether the termination was by mutual agreement, whether the Senior Pastor was unilaterally terminated, whether the termination procedure utilized was according to the terms of the employment agreement, whether the employment agreement had expired, whether the Senior Pastor was an at-will employee, and whether the Senior Pastor had forfeited the contract.

The Church filed this original proceeding. The Church maintains that the trial court lacks subject matter jurisdiction over this case because the Senior Pastor's claims are constitutionally barred under the ministerial exception and the ecclesiastical abstention doctrine.

**Standard of Review**

Mandamus is warranted when the relator demonstrates a clear abuse of discretion and there is no adequate appellate remedy. *E.g., In re St. Thomas High School*, 495 S.W.3d 500, 506 (Tex. App.—Houston [14th Dist.] 2016, orig. proceeding). A trial court lacks discretion and must dismiss the case as a ministerial act when it lacks subject matter jurisdiction. *Id.* Mandamus is thus proper when a trial court acts without subject matter jurisdiction. *Id.*

"Lack of jurisdiction may be raised by a plea to the jurisdiction when religious-liberty grounds form the basis of the jurisdictional challenge." *Westbrook v. Penley*, 231 S.W.3d 389, 394 (Tex. 2007). We review de novo a plea to the jurisdiction questioning the trial court's subject matter jurisdiction. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). In doing so, we focus first on the plaintiff's petition to determine whether the pled facts affirmatively demonstrate that subject matter jurisdiction exists. *Id.* We construe the pleadings liberally in the plaintiff's favor. *Id.* If a plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court may consider evidence beyond the pleadings and must do so when necessary to resolve the jurisdictional issues raised. *Id.* at 227; *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). The court must grant the plea as a matter of law if there is an incurable jurisdictional defect. *St. Thomas*, 495 S.W.3d at 506.

**Applicable Law**

The First Amendment of the United States Constitution provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I. The free exercise clause precludes, among other things, government action that burdens the free exercise of religion "by encroaching on the church's ability to manage its internal affairs." *Torralva v. Peloquin*, 399 S.W.3d 690, 695–96 (Tex. App.—Corpus Christi 2013, pet. denied) (quoting *Westbrook v. Penley*, 231 S.W.3d 389, 395) (Tex. 2007)). After the

ratification of the Fourteenth Amendment, the limitations on Congress in the First Amendment became equally applicable to state action abridging religious freedom. *See Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947). To enforce this constitutional provision, federal and state courts have utilized the so-called "ecclesiastical abstention doctrine" and the "ministerial exception." *Reese v. General Assembly of Faith Cumberland Presbyterian Church in America*, 425 S.W.3d 625, 627 (Tex. App.—Dallas 2014, no pet.).

The broad ecclesiastical abstention doctrine prohibits civil courts from exercising jurisdiction over matters concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713–14 (1976); *see also Patton v. Jone*s, 212 S.W.3d 541, 547–48 (Tex. App.—Austin 2006, pet. denied) (ecclesiastical abstention doctrine "prevents secular courts from reviewing many types of disputes that would require an analysis of 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required'") (quoting *Watson v. Jones*, 80 U.S. 679, 733 (1871)). "Although wrongs may exist in the ecclesiastical setting, and although the administration of the church may be inadequate to provide a remedy, the preservation of the free exercise of religion is deemed so important a principle it overshadows the inequities that may result from its liberal application." *Williams v. Gleason*, 26 S.W.3d 54, 59 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Thus, courts accept as final and binding an ecclesiastical institution's decisions on such matters. *See Patton*, 212 S.W.3d at 547.

In that regard, the doctrine does not foreclose civil court subject matter jurisdiction over all disputes involving religious entities. Because churches, their congregations, and their hierarchies exist and function within the civil community, they are amenable to rules governing civil, contract, and property rights in appropriate circumstances. *St. Thomas*, 495 S.W.3d 507.

"To determine whether the doctrine applies, courts must analyze whether a particular dispute is ecclesiastical in nature or simply a civil dispute in which church officials happen to be involved." *In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d 347, 353 (Tex. App.—Dallas 2017, orig. proceeding).

The ecclesiastical abstention doctrine is routinely applied, however, to bar civil disputes involving the termination of clergy or other church employees. For example, in *Reese v. General Assembly of Faith Cumberland Presbyterian Church in America*, Pastor Charles Reese entered into an employment agreement with Faith Cumberland Presbyterian Church in America and was ultimately terminated. 425 S.W.3d at 626. This Court held that the trial court correctly determined that it lacked subject matter jurisdiction over the pastor's claims because "if the Court were to second guess the Church's decision to terminate Reese it would deprive the Church of its right "to shape its own faith and mission" by "imposing an unwanted minister." *Id.* at 628–29 (quoting *Hosanna–Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.*, 132 S.Ct. 694, 709 (2012)). To reach this conclusion, this Court looked to the "substance and effect of [Reese's] complaint to determine its ecclesiastical implication, not its emblemata." *Id.* at 627–28.

In *Kelly v. St. Luke Community United Methodist Church*, we concluded the ecclesiastical abstention doctrine applied and prohibited the trial court from exercising jurisdiction over certain claims brought by a church's former Director of Operations against the church following her termination because "the substance of Kelly's claims for negligence, fraud, misrepresentation, age and sex discrimination, and defamatory statements published within the church community relates to internal matters of church governance and each of those claims is 'inextricably intertwined' with those internal matters." *Kelly v. St. Luke Cmty. United Methodist Church*, No. 05-16-01171-CV, 2018 WL 654907, at *8 (Tex. App.—Dallas Feb. 1, 2018, pet. denied) (mem. op.). We noted that although "the elements of those claims can be ascertained using secular principles, the application

–8–

of those principles to impose civil liability on appellees would impinge upon the church's ability to manage its internal affairs." *Id.*

Similarly, in *Jennison v. Prasifka*, we applied the ecclesiastical abstention doctrine to an Episcopal priest's claims of slander, tortious interference with a contractual relationship, and wrongful discharge against a church parishioner because those claims were inextricably intertwined with the church's investigation of his performance as a priest and the discipline imposed by the church for inadequate performance. 391 S.W.3d 660, 668 (Tex. App.—Dallas 2013, no pet.). As such, we concluded the substance of the suit related to internal matters of church governance and discipline and, therefore, the trial court was constitutionally prohibited from exercising subject matter jurisdiction over the suit. *Id.* at 668.

In *McClure v. Salvation Army*, the Fifth Circuit affirmed the dismissal of a Title VII complaint for want of jurisdiction brought by Mrs. Billie McClure against the Salvation Army. 460 F.2d 553, 560–61 (5th Cir. 1972). Mrs. McClure was an ordained minister of the Salvation Army. *Id.* at 554. The Fifth Circuit concluded that "the application of the provisions of Title VII to the employment relationship existing between The Salvation Army and Mrs. McClure, a church and its minister would result in an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment."
*Id.* at 560. In so holding, the *McClure* court explained as follows:

> The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection. It is unavoidably true that these include the determination of a minister's salary, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church.

*Id.* at 558–59.

In *Mouton v. Christian Faith Missionary Baptist Church*, Roland Mouton, Jr. and Delorian Morgan Jones sued Christian Faith Missionary Baptist Church and its pastor, Corey Wilson, and other church members after Mouton and Jones were expelled from church membership and Wilson was elected as the church's pastor. 498 S.W.3d 143, 146 (Tex. App.—Houston [1st Dist.] 2016, no pet.). The trial court granted the church's plea to the jurisdiction based upon the ecclesiastical abstention doctrine and the appellate court affirmed. *Id.* In so holding, the *Mouton* court explained that courts "should not involve themselves in matters relating to the hiring, firing, discipline, or administration of clergy" because

> The relationships between an organized church and its ministers is its lifeblood and the minister is the primary agent by which a church seeks to fulfill its purpose. Thus, courts may not attempt to right wrongs related to the hiring, firing, discipline, or administration of clergy because while such wrongs may exist and be severe, and although the administration of the church may be inadequate to provide a remedy, the preservation of the free exercise of religion is deemed so important a principle it overshadows the inequities which may result from its liberal application. Accordingly, matters concerning this relationship must be recognized as of prime ecclesiastical concern.

*Id.* at 150–51 (internal citations and quotations omitted). The court determined that "although appellants characterize their claims as purely secular because they rest on provisions of the church's corporate documents, the trial court could not adjudicate this case without interfering in inherently ecclesiastical matters of pastoral selection and church discipline." *Id.* at 152. As a result, the trial court lacked jurisdiction over the case. *Id.*

**Discussion**

This case, like *Reese,* involves the termination of a minister. And, like *Kelly*, *Jennison*, *Mouton*, and *McClure*, this case involves questions surrounding the termination of a church employee and allegations surrounding that termination. Like the claims asserted in those cases, the Senior Pastor's claims do not present purely secular issues of contract law first and foremost because he was not terminated from a secular position. Moreover, the Senior Pastor was not

terminated based on secular rules or procedures. Rather, the Church presented evidence that the Church Conference, which is comprised solely of members in good standing of the Church, voted to terminate the Senior Pastor's employment "consistent with the internal policies and procedures of the Church." As such, to determine if the Church was required to pay the Senior Pastor severance under the contract, the trial court will be required to determine why the Senior Pastor was terminated and, if the termination was for misconduct, the court will be required to determine if the Senior Pastor was properly terminated for misconduct as defined by the Church's Book of Discipline and ecclesiastical rules. Each of these determinations will require the fact finder to engage in an analysis of the Church's internal governance, the reasons for the Church Conference's vote to terminate the Senior Pastor, and whether the Church Conference followed the Church's bylaws and rules. Even if the Senior Pastor is correct that the Church Conference made a unilateral decision to terminate the Senior Pastor, to make that determination the trial court must consider the procedures and reasons for the Church Conference's vote, both of which are either governed by or touched in part by the Church's ecclesiastical teachings and rules. The ecclesiastical nature of the dispute cannot be severed from the contractual issues asserted by the Senior Pastor.

Accordingly, we conclude that the ecclesiastical abstention doctrine applies to the Senior Pastor's claims and constitutionally barred the trial court from asserting jurisdiction over those claims. As such, the trial court abused its discretion by denying the Church's plea to the jurisdiction. Having determined that the ecclesiastical abstention doctrine applies here, we do not address whether the ministerial exception is also a jurisdictional bar to the Senior Pastor's claims.

We conditionally grant the writ of mandamus and direct the trial court to issue written rulings vacating the order denying the Church's plea to the jurisdiction and granting the Church's plea to the jurisdiction within thirty days of the date of this opinion.  The writ will issue should the trial court fail to comply.


/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE


181533F.P05