Opinion by Justice Whitehill
This original proceeding involves an issue of first impression for this Court: whether the ecclesiastical abstention doctrine applies to faith-based schools not owned or operated by a church.[1] If that doctrine applies here as a general matter, a second question is whether the plaintiffs' claims implicate the school's ability to manage its internal affairs such that the doctrine defeats the trial court's subject matter jurisdiction over those claims.
The Episcopal School of Dallas (the school) seeks a writ of mandamus compelling the trial court to vacate an order denying its plea to the jurisdiction. In two issues, the school maintains that (i) it is a faith-based school and therefore the ecclesiastical abstention doctrine deprives the court of subject matter jurisdiction over the plaintiffs' claims arising from the school's decision to request a student's withdrawal for disciplinary reasons and (ii) there is no adequate remedy by appeal.
Because the undisputed facts establish that (i) the school is a faith-based institution to which First Amendment protections apply, (ii) this dispute turns solely on the school's ability to manage its internal affairs, including its admissions decisions, and (iii) mandamus is appropriate when a court acts without subject matter jurisdiction, we sustain both issues and conditionally grant the requested relief.
I. Background
The school is a private, college preparatory school founded in 1974 by an Episcopal clergyman and a group of local Episcopalian leaders. It is a tax-exempt, non-profit corporation school.
Plaintiff John Doe, Jr. (Doe) was a student at the school. Plaintiff John Doe is Doe's father. They are collectively the Does.
*351 Dishonesty, refusal to consent to a search, and drug use and possession violate school policy. Furthermore, the school's handbook provides that refusal to allow an interior vehicle search "will be cause for suspension, termination of campus driving and parking privileges, and potential reconsideration of student's enrollment at [the school]."
The handbook also provides for punishing certain infractions, including dishonesty and drug possession. Moreover, parents and students acknowledge in writing that the school may impose disciplinary consequences, including termination of enrollment, for conduct the school deems unsatisfactory.
Additionally, the school's enrollment and tuition agreement provides that:
The enrollment of Student is entirely at ESD's discretion and the school reserves the right to dismiss Student or to discontinue further enrollment at any time for conduct ... whether on or off school property, which it deems ... unsatisfactory.
The agreement further provides that the school "may terminate Student's enrollment for any reason," and "students may be disciplined including but not limited to suspension and expulsion."
The school sent upper school parents, including John Doe, a letter stating among other things "that in most cases , students should be given a chance to redeem themselves" and that "we are not a zero tolerance school." (Emphasis added).
Doe was a student during the 2014-2015 school year. One day, he violated school policy by leaving campus for lunch without permission. A neighbor reported to the school that two students (one of whom was later proved to be Doe) were parked in front of her house smoking marijuana, and she called the police.
Doe initially denied leaving campus, but a security camera showed otherwise.
Doe then admitted leaving but denied smoking marijuana. Doe's companion, however, admitted smoking marijuana and said that Doe participated.
Doe also refused a search of his vehicle.
Although Doe passed an initial urine drug test, the school later learned that he used another student's specimen for the test. Doe failed a second drug test.
The school subsequently asked Doe to withdraw from school in lieu of being expelled. Doe withdrew.
Based on these and additional related facts, the Does sued the school, head of school Meredith Cole, head of upper school Donna Hull, and the assistant head of upper school Jeffrey Laba (collectively, Relators). The lawsuit complains about Relators' disciplinary actions and the application of the school's policies and procedures. The suit alleges these claims against some or all Relators: (i) breach of fiduciary duty, (ii) aiding and abetting fiduciary breaches, (iii) breach of express warranties under the Texas Deceptive Trade Practices Act, (iv) negligent misrepresentation, (v) fraud, (vi) negligent hiring and supervision, (vii) negligence and gross negligence, (viii) tortious interference with a contract, (ix) breach of contract, (x) promissory estoppel, unjust enrichment, money had and received/assumpsit, (xi) intentional infliction of emotional distress, and (xii) respondeat superior and vicarious liability. The Does also requested a declaratory judgment concerning the parties' rights and obligations under the school's enrollment agreement and student handbook, and a declaration concerning damages. The school counterclaimed for breach of the tuition and enrollment *352 agreement.[2]
Five months before the dispositive motion deadline and after considerable discovery was done, Relators filed a plea to the jurisdiction and motion to dismiss asserting that the ecclesiastical abstention doctrine deprives the court of subject matter jurisdiction. After additional jurisdiction-based discovery and a hearing continuance, the court heard and denied the motion and plea. The court also denied a motion to stay the proceedings pending mandamus review.
Relators' mandamus petition followed and is at issue here. We stayed the trial court proceedings pending our mandamus determination.
II. Analysis
A. Standard of Review
Mandamus is warranted when the relator demonstrates a clear abuse of discretion and there is no adequate appellate remedy. E.g. , In re St. Thomas High School , 495 S.W.3d 500, 506 (Tex. App.-Houston [14th Dist.] 2016, orig. proceeding). A trial court lacks discretion and must dismiss the case as a ministerial act when it lacks subject matter jurisdiction. Id. Mandamus is thus proper when a trial court acts without subject matter jurisdiction. Id.
"Lack of jurisdiction may be raised by a plea to the jurisdiction when religious-liberty grounds form the basis of the jurisdictional challenge." Westbrook v. Penley , 231 S.W.3d 389, 394 (Tex. 2007).
We review de novo a plea to the jurisdiction questioning the trial court's subject matter jurisdiction. See Texas Dep't of Parks & Wildlife v. Miranda , 133 S.W.3d 217, 226 (Tex. 2004). In doing so, we focus first on the plaintiff's petition to determine whether the pled facts affirmatively demonstrate that subject matter jurisdiction exists. Id. at 226. We construe the pleadings liberally in the plaintiff's favor. Id. If a plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court may consider evidence beyond the pleadings and must do so when necessary to resolve the jurisdictional issues raised. Id. at 227 ; Bland Indep. Sch. Dist. v. Blue , 34 S.W.3d 547, 555 (Tex. 2000). The court must grant the plea as a matter of law if there is an incurable jurisdictional defect. See St. Thomas , 495 S.W.3d at 506.
B. The Ecclesiastical Abstention Doctrine
The ecclesiastical abstention doctrine arises from the First Amendment's Free Exercise Clause and applies to the states through the Fourteenth Amendment. See U.S. CONST. amends. I, XIV ; St. Thomas , 495 S.W.3d at 507. Courts "give great deference to the First Amendment's freedom of religion guarantee." In re Godwin , 293 S.W.3d 742, 745 (Tex. App.-San Antonino 2009, orig. proceeding). Among its prohibitions, the Free Exercise Clause precludes government action that burdens the free exercise of religion "by encroaching on the church's ability to manage its internal affairs." Westbrook , 231 S.W.3d at 395.
This doctrine thus "prevents secular courts from reviewing many types of disputes that would require an analysis of theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the *353 standard of morals required." Patton v. Jones , 212 S.W.3d 541, 547-48 (Tex. App.-Austin 2006, pet. denied).
"Although wrongs may exist in the ecclesiastical setting, and although the administration of the church may be inadequate to provide a remedy, the preservation of the free exercise of religion is deemed so important a principle that it overshadows the inequities that may result from its application." Williams v. Gleason , 26 S.W.3d 54, 59 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd) ; accord , In re Godwin , 293 S.W.3d at 750. Thus, courts accept as final and binding an ecclesiastical institution's decisions on such matters. See Patton , 212 S.W.3d at 547.
In that regard, the doctrine does not foreclose civil court subject matter jurisdiction over all disputes involving religious entities. Because churches, their congregations, and their hierarchies exist and function within the civil community, they are amenable to rules governing civil, contract, and property rights in appropriate circumstances. St. Thomas , 495 S.W.3d at 507. To determine whether the doctrine applies, courts must analyze whether a particular dispute is ecclesiastical in nature or simply a civil dispute in which church officials happen to be involved. Id.
As an initial matter, the Does urge that the doctrine does not apply here because the school is not a church, owned by a church, or run by a church, and does not have religion as its "primary purpose." In short, the Does contend, without supporting authorities, that the doctrine applies only to churches or church owned entities. But our sister courts routinely apply the doctrine to dismiss suits against religious schools or officials with authority over religious schools. See St. Thomas , 495 S.W.3d at 509 (citing cases). We agree with their reasoning. Thus, our first question is whether the record conclusively establishes that the doctrine applies to this school.
C. Is the school a faith-based institution?
1. Facts Showing that the School Is Faith-Based
The record establishes these facts bearing on whether the school is a faith-based institution entitled to First Amendment protection:
One, the school's articles of incorporation state that its "primary purpose is to operate a non-profit, college preparatory middle and upper school, committed to the Christian gospel as interpreted by the Protestant Episcopal Church of the United States of America."
Two, its bylaws require that at "least one-half of all directors serving at any time shall be communicants of the Episcopal Church in the United States of America."
Three, the school's stated mission is to create a "Christian community that places the honor and worship of God at the center of its common life" and embraces "diversity and inclusion" and the school's founding belief that "[a]ll children are made in the image of a loving God." The mission statement further refers to "faith as [an] essential element of student development." The school's founding tenets are daily worship, community, ethical decision making, and service, and it emphasizes a "faith-centered environment" that promotes "[n]urturing a spiritual relationship with God through the use of the Book of Common Prayer."
Four, students and faculty are required to attend and participate in daily chapel, and students must complete mandatory religious curriculum requirements. The religious curriculum includes courses studying (i) major world religions, (ii) Jewish and *354 Christian texts, (iii) ethical reasoning, and (iv) religious experiences.
Five, the Dallas Episcopal Diocese assigns ordained Episcopal priests to conduct chapel and Eucharist services at the school. A student's absence from chapel is considered an unexcused absence subject to disciplinary action.
Six, the Senior Chaplain is "responsible for pastoral care and chapel services" at the school and "oversees all spiritual components within the [SCHOOL'S] program." The Senior Chaplain also sits on the school's Daily Worship and Religious Life Board Committee and uses the Book of Common Prayer to design and implement daily worship at the school.
Seven, both the Senior Chaplain and the lower school Chaplain conduct daily worship and monthly or weekly Eucharist services. The Dallas Episcopal Diocese Bishop also periodically conducts Eucharist services.
Eight, beginning in 1995, the lower school operated on church grounds pursuant to an occupancy agreement between the school and St. Michael and All Angels Episcopal Church, with the church premises being used "for the purpose of operating an Independent Episcopalian co-educational school ... through Grade 6 substantially in accordance with [the school's] Mission Statement."
Nine, that occupancy agreement states that "[a]ll spiritual instruction at the School will be in conformity with the doctrine, discipline and worship of the Episcopal Church of the United States of America. In the event of a dispute regarding spiritual instruction, the matter shall be settled by appeal to the Bishop of the Episcopal Diocese of Dallas and his determination shall be final in the matter."
Ten, the school is a member of the National Association of Episcopal Schools (NAES) and its head of school is a NAES board member. NAES confirms that "[a]s embodiments of the Christian faith, Episcopal schools ... serve God in Christ in all persons, regardless of origin, background, ability, or religion" and "strive for justice and peace among all people and to respect the dignity of every human being."
Eleven, the school's website further emphasizes that the school is a faith-based institution.
Twelve, the school's symbol and motto are faith-based, and both the student and faculty handbooks confirm the school's faith-centered mission and founding tenets.
Thirteen, as a condition of enrollment, students and their parents agree to abide by the code of conduct, the student handbook, and other "principles and standards" of the school community. Indeed, all members of the school's community commit to the code of conduct, which recognizes "everyone is created in the image of God" and requires the school community members to "conduct themselves with honor, respect, and integrity in a manner consistent with the ideals of [THE SCHOOL'S]'s Mission Statement." This code of conduct appears in the student handbook and incorporates, among other things, an academic honor pledge, sportsmanship expectations, and state laws related to illegal drugs and underage drinking.
2. The Does' Proffered Facts
The Does, however, rely on the following to argue that the school is not a faith-based institution or a church:
• The school represents to the IRS that it is a school, not a church;[3]
*355 • The majority of the school's students are not Episcopalian;
• The school is not part of the Dallas Episcopal Diocese and receives no money from the Diocese;
• The Episcopal church does not own, operate, or control the school;
• None of the school's board members are Episcopal clergy, and only half are Episcopalian;
• The teachers and staff need not be Episcopalian;
• The school's two chaplains are the only two school employees who are Episcopal clergy;
• The school does not give admission preference or discounts to Episcopalian students, actively recruits students of all faiths, and makes no effort to track the religious affiliation of its faculty and staff;
• The school does not prepare students for the seminary;
• The school has obtained bond financing "holding itself out to local government entities as a secular scholastic institution;"[4]
• No member of the Episcopal clergy was consulted or involved in the school's decision regarding Doe, Jr.;
• Chapel services often include secular topics;
• Over 85% of the schools' students in 2016-17 self-identified as non-Episcopalians;
• When its action regarding Doe, Jr. was taken, the school's board chair was Jewish, and the board consulted non-clergy, outside lawyers regarding that decision; and
• Only one unit of religious instruction (out of a total of twenty-four units) is required, and none of the offered religion courses focus exclusively on the Episcopal denomination.
These facts are similar to St. Thomas 's facts in the sense that they show the school is in fact a school and not a church as such. But these facts similarly do not negate the fact that the school endeavors to imbue its students and staff with Christian principles and values even if those persons do not already subscribe to them. See St. Thomas , 495 S.W.3d at 508-09.
The record thus leaves only one reasonable conclusion: the school's purpose and mission are religious. And that the school may not be an affiliate of or have a formal legal relationship with a specific church does not undermine the factual conclusion that it is a faith-based institution. Id.
*356 3. St. Thomas and In re Vida
The Does argue that RELATORS's reliance on St. Thomas , 495 S.W.3d at 502 and In re Vida , No. 04-14-00636-CV, 2015 WL 82717, at *2 (Tex. App.-San Antonio Jan. 7, 2015, orig. proceeding) (mem. op.) for the premise that the ecclesiastical abstention doctrine warrants dismissal here is misplaced. We disagree.
a. In re Vida
In re Vida involved a lawsuit filed by the parents of a child who was not promoted to first grade in a Catholic school. The parents' claims were based on the school's enforcement of the age requirements in the school's policy manual. They claimed that the requirement was purely secular, raised no religious objections, and was unrelated to church governance. The San Antonio Court of Appeals disagreed and held that the ecclesiastical abstention doctrine deprived the court of jurisdiction. In re Vida , 2015 WL 82717, at *2.
In so doing, the court noted that the analysis requires considering both the substance and nature of the claim and the effect of a judicial resolution. Id. at *2-3. The court further held that "if a judicial resolution of the claim will interfere with a church's management of its internal affairs or encroach upon the church's internal governance, the court may not exercise jurisdiction over the claim"-even if the decision requires no analysis of religious doctrine. Id. Finally, the court held that the doctrine applies equally to Catholic schools as well as churches. Id. at *3.
b. St. Thomas
St. Thomas concerned a lawsuit filed by the parents of a student expelled from a Catholic high school. The school filed a plea to the jurisdiction invoking the ecclesiastical abstention doctrine. The trial court denied the plea and entered a temporary injunction allowing the student to attend for the remainder of the semester. St. Thomas , 495 S.W.3d at 504.
The Houston Fourteenth District Court of Appeals, however, held that the doctrine applied and granted the school's request for mandamus relief. Id. at 514. In doing so, the court rejected the parents' characterization of the lawsuit as a "purely commercial dispute regarding an agreement for [the school] to prepare [the student] for college" and noted that the school's status as a Catholic high school did not place it outside the ecclesiastical abstention doctrine. Id. at 513. To this end, the court stated, "No less than a Catholic church [the school] is a religious institution enjoying First Amendment protection for the free exercise of religion." Id. at 509.
The Does argue that St. Thomas is distinguishable because they are not seeking specific performance and Doe has already graduated from high school. They further assert that unlike this case, St. Thomas involved a significant spiritual and ecclesiastical component.
The Does' analysis, however, misses the point. While St. Thomas was partially based on the fact that the parents' letter to the school that led to the student's expulsion included "spiritual standards and references to Catholic teaching," that was not the court's emphasis. Specifically, the court noted that the key inquiry is whether a judicial resolution will encroach on the institution's governance and affairs, and concluded that, "[i]n addition to express references to spiritual standards and Catholic teaching, this record demonstrates impermissible interference with [the school's] management of its internal affairs and encroachment upon its internal governance." Id. at 513.
Here, the policies that form the basis of the Does' complaints are based on spiritual *357 references and the teachings of the Episcopal church. In fact, the Does tacitly acknowledge this fact by complaining that the administrators failed "to serve as examples of how students should direct their lives spiritually and morally."
c. The Does' Additional Arguments
The Does next argue that the school's "primary focus is not religion" and seem to suggest that the school is not "Episcopal enough" to be categorized as a faith-based institution because, unlike the school in St. Thomas , the school does not offer a traditional Episcopal education with traditionally structured daily worship. The Does also underscore the school's inclusive admission policy, the number of students and faculty who are not members of the Episcopal faith or are not Episcopal clergy, and the absence of a strictly Episcopal curriculum as also demonstrating that the school is not a faith-based school.
But the school's non-discriminatory, inclusive philosophies do not mean it is not a religious institution; it is just an inclusive one. And the Does cite no authority for the premise that the ecclesiastical abstention doctrine requires a showing that an institution's "primary purpose" is religion. More importantly, asking this Court to examine and compare the contours of different religions or measure the internal application of Episcopal precepts to the school's policies or its conduct here seeks to have us engage in the exact analysis the First Amendment precludes.
In sum, it is undisputed that the school is not a church. But the record establishes that it is nonetheless a faith-based institution "enjoying First Amendment protection for the free exercise of religion." See St. Thomas , 495 S.W.3d at 509. Thus, contrary to the Does' assertion, we cannot conclude that this case lacks an "ecclesiastical component."
D. The Nature of the Does' Claims
Next, we consider the substance and nature of the Does' claims, all of which concern Doe's disciplinary action. The Does characterize the lawsuit as a "secular breach of contract and tort" action, and they allege that the school's representations that it had a "forgiving and non-punitive disciplinary system and was not a 'zero tolerance' school" were false. According to the Does, Doe was treated differently than other students with similar disciplinary infractions and, contrary to the school's stated policies, was expelled based on a solitary instance of alleged bad behavior. The facts, however, conclusively establish that this dispute derives solely from the calculus of the school's internal policies and management of its internal affairs, all directed at the school's decision regarding whether Doe should be a member of the school community. Thus, this dispute fits entirely within the parameters of a dispute for which the ecclesiastical abstention doctrine applies. See Westbrook v. Penley , 231 S.W.3d 389, 395 (Tex. 2007).
Nonetheless, the Does describe their claims as "simply civil law claims in which church officials happen to be involved," similar to the claims in Shannon v. Memorial Drive Presbyterian Church , 476 S.W.3d 612, 619 (Tex. App.-Houston [14th Dist.] 2015, pet. denied) and Tilton v. Marshall , 925 S.W.2d 672, 677-79 (Tex. 1996). We are not persuaded because Shannon and Tilton did not involve the internal governance and affairs of a faith-based institution.
For example, Shannon involved a former employee's tort and breach of contract suit against a church arising out of a breach of a settlement agreement containing a non-disparagement clause. Shannon , 476 S.W.3d at 619. Because the suit required only the court's interpretation of *358 the contract and did not require the court's intervention in hiring, firing, discipline, or administration of the church's clergy, or matters of morality or church doctrine, the court concluded that the matter was a "civil law controversy in which Church officials happened to be involved." Id. at 624-25.
Shannon is distinguishable from the instant case. That case did not require encroaching on a faith-based institution's management of its internal affairs, but rather a secular contract breach. As the St. Thomas court observed, however, the "secular contract" approach does not apply when the claimed breach of contract arises from an enrollment agreement at a faith-based institution. See St. Thomas , 495 S.W.3d at 509.
Likewise, Tilton is factually distinguishable from the present case. In Tilton , several television viewers sued evangelist Robert Tilton for fraud, conspiracy, and intentional infliction of emotional distress regarding "prayer cloths" he sold and promised to bless. 925 S.W.2d at 675-76. The court held that the ecclesiastical abstention doctrine applied to some, but not all of the claims. Id. at 679-80.
Specifically, the court held that claims concerning Tilton's representations that he would perform certain concrete acts such as personally reading, touching, and praying over plaintiffs' prayer requests were not claims based on religious doctrine or belief, but rather alleged promises to perform certain acts. Id. On the other hand, claims based on Tilton's statements of religious doctrine were not subject to court review because such claims would require the fact-finder to resolve the truth or falsity of religious doctrine or beliefs, an inquiry that is constitutionally proscribed. Id. Thus, the court conditionally granted the writ in part, directing the trial court to dismiss the plaintiffs' conspiracy and intentional infliction of emotional distress claims. Id. at 682.
This case, however, requires no such claim fracturing. The Does' claims all concern a faith-based organization's internal affairs, governance, administration, membership, or disciplinary procedures and are protected religious decisions. Thus, the Does' suit has no secular aspect for the courts to consider.
In particular, the Does' breach of fiduciary duty claims concern allegations of fabricated evidence to justify Doe's expulsion, i.e., internal application of internal policies. Likewise, the DTPA, fraud, negligent misrepresentation, tortious interference, breach of contract, promissory estoppel, unjust enrichment, and intentional infliction of emotional distress claims are all based on the school's application of internal policies, procedures, and guidelines set forth in the code of conduct and school handbooks. For example, the Does allege that the school committed fraud "by and through the School's Student Handbook, with the School's Code of Conduct ... and the School's policies" by "maintain[ing] secret or alternative policies and procedures related to discipline." Similarly, the Does contend that the school was negligent and grossly negligent in providing "the education services outlined in the school's policies and procedures." Indeed, all of their claims are based on the same common theme. And the Does do not explain how a court might resolve any of these claims without referring to the school's internal policies and governance of its own affairs.
We acknowledge that the dispute does not expressly concern religious doctrine in all respects. But we also note that St. Thomas and Vida did not do so either. St. Thomas involved the expulsion of a student based on the school handbook. Vida concerned age requirements in the school's policy manual. And as the St. Thomas *359 court observed, "exclusive focus on the presence or absence of an express dispute concerning religious doctrine demonstrates an unduly narrow conception of [the doctrine's] applicable protections." St. Thomas , 495 S.W.3d at 509.
Finally, the Does refer to a county court jury verdict against the school to argue that the school ignores "infamous and on-point local precedent" establishing that it cannot rely on the ecclesiastical abstention doctrine. However, trial court judgments are not "binding precedent." See, e.g., Swilley v. McCain , 374 S.W.2d 871, 875 (Tex. 1964) (after a principle, rule or proposition of law has been decided by the Supreme Court or the highest court in a state, the decision is accepted as binding precedent); Dee v. Crosswater Yacht Club, LP , No. 03-10-00796-CV, 2012 WL 1810213, at *5 (Tex. App.-Austin May 18, 2012, no pet.) (mem. op.) (decisions of trial court not legally binding precedent for appellate court). This argument, therefore, adds nothing to our analysis.
We have concluded that the school is a faith-based school. Having examined the substance and nature of the Does' claims, we further conclude that resolving those claims would require a court to pass judgment on the school's internal affairs and governance-matters exclusively within the province of an ecclesiastical institution. Accordingly, the ecclesiastical abstention doctrine applies, the trial court lacks subject-matter jurisdiction, and it abused its discretion by denying Relators' plea to the jurisdiction and motion to dismiss.
Having concluded that the ecclesiastical abstention doctrine applies, we next consider whether Relators are entitled to mandamus relief.
E. Are Relators entitled to mandamus relief?
The supreme court rejects a categorical approach to determining when mandamus review is appropriate. See In re McAllen Med. Ctr., Inc. , 275 S.W.3d 458, 469 (Tex. 2008) (orig. proceeding). Unlike a direct appeal, which is a matter of right, mandamus is an extraordinary remedy, intended to be available in only limited circumstances at the court's discretion. See In re Reece , 341 S.W.3d 360, 374 (Tex. 2011) (orig. proceeding). Thus, mandamus review is reserved for trial court errors where the very act of proceeding to trial, regardless of the outcome, would defeat the substantive right involved. See In re Schmitz , 285 S.W.3d 451, 459 (Tex. 2009) (orig. proceeding).
To obtain mandamus relief, a relator must show either (i) the underlying order is void or a clear abuse of discretion and, (ii) no adequate appellate remedy. See In re Nationwide Insurance Co. , 494 S.W.3d 708, 712 (Tex. 2016) (orig. proceeding); see also St. Thomas , 495 S.W.3d at 514 (mandamus is generally proper if a trial court lacks subject matter jurisdiction over the underlying proceeding, and relator need not establish lack of an adequate appellate remedy); In re Dickason , 987 S.W.2d 570, 571 (Tex. 1998) (orig. proceeding) (if a court issues an order beyond its jurisdiction, the relator need not show there is no adequate remedy by appeal).
We have already concluded that the trial court lacks subject matter jurisdiction. Therefore, mandamus relief is appropriate unless the Does established a bar that would defeat the doctrine's application in this case.
F. Does laches bar the requested relief?
The Does argue that Relators' "unexplained nineteen month delay" in raising the ecclesiastical abstention doctrine *360 precludes the requested relief based on laches.
Laches is an equitable remedy that prevents asserting a claim due to the lapse of time. See Bluebonnet Sav. Bank, F.S.B. v. Grayridge Apt. Homes, Inc. , 907 S.W.2d 904, 912 (Tex. App.-Houston [1st Dist.] 1995, writ denied). For laches to bar a mandamus action, a real party in interest ordinarily must show (i) the opposing party's unreasonable delay in asserting its rights and (ii) the real party in interest's good faith and detrimental change in position because of the delay. In re Laibe Corp. , 307 S.W.3d 314, 318 (Tex. 2010) (orig. proceeding) (per curiam). Whether a party's delay in asserting its rights results in laches depends on the circumstances. In re Oceanografia, S.A. de C.V. , 494 S.W.3d 728, 730 (Tex. 2016) (orig. proceeding) (per curiam).
It is not accurate to state that Realtors offered no explanation for the delay in the trial court. To the contrary, they explained that they were waiting to complete sufficient discovery to present a comprehensive plea to the jurisdiction. Relators also said that during that time, the St. Thomas case was decided, which they believed confirmed the strength of its jurisdictional argument. Therefore, Realtors maintain there was no unreasonable delay.
Although the Does claim that they have "undoubtedly" been "severely prejudiced" by the delay, and they "expended significant resources" responding to Realtors' summary judgment motion before the case was stayed, they do not identify any good faith and detrimental change in position resulting from the delay in their lawsuit.
In fact, the Does opposed Relators' requested stay of the trial court proceedings pending resolution of this issue, and requested a continuance and further discovery before the plea to the jurisdiction was heard by the court. Consequently, they are at least partially responsible for some of the resource expenditure about which they now complain.
More importantly, however, the relevant time period is not measured from the time the ecclesiastical abstention doctrine was raised in the court below.[5] Instead, unreasonable delay is calculated with reference to the mandamus petition's filing, not the issue that precipitated the request for a writ. See, e.g., In re Laibe Corp. , 307 S.W.3d 314, 318 (Tex. 2010) (orig. proceeding) (measuring time between denial of reconsideration motion and mandamus filing and concluding two months not unreasonable delay); In re Sthran , 327 S.W.3d 839, 846 (Tex. App.-Dallas 2010, orig. proceeding) (measuring time between trial court's order and filing mandamus petition and concluding no unreasonable delay).
Here, Realtors filed the mandamus petition two weeks after the plea to the jurisdiction was denied. That does not constitute unreasonable delay. Therefore, laches does not bar the requested relief.
III. Conclusion
Mandamus relief is proper here. We lift our May 17, 2017 order staying all trial court proceedings, and conditionally grant Relators' petition for writ of mandamus. We order the trial court to issue orders within fifteen days (i) vacating its April 24, 2017 Order denying Relators' plea to the jurisdiction, and (ii) granting the Realtors' plea to the jurisdiction and dismissing the *361 case. A writ will issue only if the trial court fails to comply.

This Court has previously applied the ecclesiastical abstention doctrine to churches. See Reese v. Gen. Assem. of Faith Cumberland Presbyterian Church in Am., 425 S.W.3d 625, 627 (Tex. App.-Dallas 2014, no pet.) ; Jennison v. Prasifka , 391 S.W.3d 660, 661 (Tex. App.-Dallas 2013, no pet.) ; Fesseha v. Ethiopian Orthodox Tewahedo Debre Meheret St. Michael's Church , No. 05-10-00202-CV, 2011 WL 2685969, at *3 (Tex. App.-Dallas July 12, 2011, no pet.) (mem. op.); Retta v. Mekonen , 338 S.W.3d 72, 77 (Tex. App.-Dallas 2011, no pet.). But we have not considered whether the doctrine applies to a faith-based school.

We treat the counterclaim as conditionally abandoned since the school asked us to order the trial court to dismiss the action.

The school checks the "school" box on its tax return form 990 instead of "church." But as St. Thomas and other Texas cases hold, being a faith-based school instead of being a church does not deny the school First Amendment freedom of religion protection. See St. Thomas , 495 S.W.3d at 509.

According to the Does, the school obtained bond funding by representing to local governments that it is a secular school and therefore should be quasi estopped to contend otherwise. But the Does' record cites do not support that factual premise. Specifically, the Does refer to a series of request for admission responses concerning the school's finances. The school, however, denied making any representations to governmental entities that the school was a secular institution. The school admitted that in at least two instances it benefitted from obtaining tax exempt financing from the governmental entities, with the Does' apparently intended inference being that the school could obtain such financing only if it represented that it was a secular entity. But the Does cite no authority for that premise, and the school made no such admission. Furthermore, the school cites Mitchell v. Helms , 530 U.S. 793, 829, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) for the premise that it is permissible for loans to be made to religious schools under the Education Consolidation and Improvement Act. It also cites LeBoon v. Lancaster Jewish Community Center Ass'n , 503 F.3d 217, 229 (3rd Cir. 2007) for the premise that religious organizations may engage in secular activities without forfeiting protections.

Further, a lack of subject matter jurisdiction can be raised at any time. See Carroll v. Carroll , 304 S.W.3d 366, 367 (Tex. 2010).