**CONDITIONALLY GRANT and Opinion Filed September 23, 2020**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-00680-CV**

**IN RE PRINCE OF PEACE CHRISTIAN SCHOOL, Relator**

**Original Proceeding from the 471st Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 471-06418-2019**

## MEMORANDUM OPINION

Before Chief Justice Burns, and Justices Myers and Evans
Opinion by Chief Justice Burns

This original proceeding arises from a suit filed by parents whose children were expelled from a religiously affiliated private school. Relator Prince of Peace Christian School contends the ecclesiastical abstention doctrine deprives the trial court of jurisdiction and thus the trial court abused its discretion in denying its plea to the jurisdiction. Because we conclude that any decision regarding the merits of this dispute would require judicial intrusion upon Prince of Peace's entitlement to manage its internal affairs according to its own policies and beliefs, we conditionally grant the writ.

# FACTUAL BACKGROUND[1]

## A. The School

Prince of Peace, a private school, defines its mission as "provid[ing] a Christ-centered, exemplary education, equipping children as disciples and leaders for service and success in the 21st century." Although established and operated for more than 30 years by Prince of Peace Lutheran Church with which it shares a campus, in 2012, the school became an independent 501(c)(3) non-profit entity. Like its mission statement, the school's Articles of Incorporation define the purpose of the corporation as providing "a Christian education program that is centered upon Biblical principles." Prince of Peace is accredited by secular organizations as well as Lutheran school organizations, which evaluate schools on the basis of their academic and spiritual qualities.

As a separate entity, Prince of Peace has no privity or legal relationship with the Lutheran Church, but is a "Recognized Service Organization" (RSO), by which it seeks to carry out the Lutheran Church's objectives, including providing a "Christ-centered" education and providing a place for its teachers to "live out their faith in word and deed." Many of its teachers and administrators are "Called" or

---

[1] We derive the relevant jurisdictional facts from Parents' Original Petition and the jurisdictional evidence submitted in response to the school's plea to the jurisdiction. We recite the facts in some detail so as to enable reliance on the incidents in question, rather than generalized or hyperbolic descriptions of those incidents.

"Commissioned" ministers,[2] having studied at synodical teaching institutions and received certifications for ministry by the faculty of those institutions or commissions from Lutheran Church congregations. According to the school's policies, even teachers and staff who are not ministers or "Called" are expected to teach Christian values and embrace their roles "as missionaries" in "making disciples" of the school's student body and their families. All of Prince of Peace's students participate in weekly chapel and theology classes, and high school students must complete four theology class credits. Devotions or prayers begin each class, and all classes are taught from a Christian point of view.

The school's code of conduct found in its Parent/Student Handbooks outline the goals of the "Christ-centered" education Prince of Peace seeks to provide, as well as the school's policies and disciplinary procedures governing its relationships with its students, their families, and its teachers and staff. Adherence to Lutheran faith principles, as reflected in scripture references, guides these goals and policies, and the Handbooks stress adherence to Christian principles and submission to the school's decisions. For example, specific scripture references frame the school's expectations of the relationship among its teachers, students and parents, such as "speaking the truth in love" (Ephesians 4:15), encouragement (1 Thess. 5:11), accountability (James 1:9), respect and trust (1 Thess. 5:12-13; Proverbs 3:56).

---

[2] Headmaster Chris Hahn, High School Principal Dr. Jeremy Lower, and former Assistant High School Principal Paul Stark, whose conduct is at issue in this proceeding, are Called or Commissioned Ministers.

–3–

Prince of Peace graduates are expected to demonstrate "principles of Christian leadership, based on integrity and service" and, "realize . . . that the policies and decisions affect many people and must be measured by Christian standards of justice, charity and empathy." Faculty members are expected to create an orderly school environment, as well as to serve as "role models of love, forgiveness, and grace that are part of a maturing relationship with Jesus Christ."

The code of conduct also includes policies against bullying, harassment, smoking, and substance abuse, and outline the school's expectations regarding conflict resolution, search and seizure and drug testing, and behavioral disorders. Each policy rests on Lutheran beliefs. All students and enrolled families agree to abide by Prince of Peace's code of conduct and its tuition contract allows Prince of Peace the right to "remove a student at any time for any reason, including failure of the parent(s) to adhere to the policies, philosophies, and procedures of the school."

**B.     Prince of Peace's discipline of Students and Parents' complaints**

During their freshman and sophomore years of high school, B.O. and S.R. (collectively "Students"), were disciplined several times by High School Assistant Principal Stark and two different coaches. Parents assert Students were on a "watch list" created by Stark for problem students; Stark and other administrative employees treated Students unfairly and "treated other students more favorably" than they treated Students; and, Stark stalked Students, including frequently entering the restroom when Students were using it and using any urinal close to where Students

–4–

were urinating. Parents contend, that Stark, through close and excessive supervision and discipline, sexually harassed Students.[3] Parents allege Students were traumatized by Stark's behavior, and B.O. developed post-traumatic stress disorder, which rendered him unable to use the restroom in the presence of any other person. Although Stark justified his close supervision of Students by claiming they were likely vaping, Parents assert Students were never caught doing so.

Near the end of Students' freshman year, they and several other students were discovered by a coach in a locker room without permission. The coach also discovered a drawing of genitalia and a homophobic message on a dry-erase board about one of the students who was present. Parents contend the coach incorrectly assumed the message reflected bullying. They assert the message and drawing were a joke and the student who was the subject of the message and drawing was neither upset nor offended.

All students who were discovered in the locker room were questioned in Stark's office. Parents allege a secretary lied to the boys about surveillance in the locker room in an effort to solicit a confession. They assert the secretary's efforts reveal discussion of "confidential discipline matters" among the office personnel and gossip about false accusations. Although Students denied writing the offending picture and message, Parents complain Students were threatened with a Saturday

---

[3] Parents do not specifically define what conduct constituted "sexual harassment," but the discussion of facts from their Petition demonstrates they rely on Prince of Peace employees' following Students into the bathroom or observing Students' entering and leaving the bathroom for this allegation.

detention. The incident—which we discern from Parents' pleadings as having been questioned in the school office rather than creating the homophobic drawing and message—was so upsetting that Students' ability to study for their exams was impaired. B.O., who suffers from several learning disorders, "had such trouble thinking clearly as a result of the incident," that he failed most of his final exams. S.R., likewise, had difficulty focusing on his studies and failed some of his exams.

Further, Parents contend Stark failed to call Parents to discuss the incident as he had informed Students he would. Instead, Parents met with the principal, Dr. Lowe, about Stark's "biased handling" of the incident, an "inappropriate" email from Stark, and his "ongoing harassment" of Students, his "obsessive stalking" of Students, as well as his "poor judgment and mismanagement of situations" involving Students. Although Dr. Lowe initially defended the "investigation and interrogations," he eventually offered repeated apologies, admitted the administration's response to the incident had been "overboard," and acknowledged Stark needed training over the summer. Dr. Lowe also conceded neither B.O. nor S.R. had ever been in "serious trouble" with the school, but also noted that Students and the group with which they associated were known on campus as a "wolf pack," which merited close supervision. Parents requested that Dr. Lowe prohibit Stark from disciplining Students without Parents' presence. Dr. Lowe agreed he would "try to keep the boys from being alone with" Stark.

Students returned to Prince of Peace for their sophomore year to even greater attention. Parents contend Stark enlisted additional faculty to harass Students, warn others that Students were "bad" and that associating with Students would end in trouble. One coach began following Students into the restroom as Stark had, and other unnamed faculty members stood outside of restrooms when Students entered.

Shortly after the semester started, Stark confronted Students in the lunchroom after they had returned from the restroom and "within view of the entire cafeteria and within earshot of at least the students and faculty at nearby tables." Stark accused Students of placing toilet paper on the bathroom floor,[4] and Parents allege Stark publicly humiliated Students to "perpetuate the myth" that they were discipline problems.

The following day, a similar incident occurred, and Stark accused Students of clogging a toilet and leaving more toilet paper on the floor, which Students denied. Stark lectured Students and threatened to restrict their bathroom privileges.

A few days later, a different coach called Students to the school office based on information from another student that Students were vaping on campus. Students had recently refused to sit with the student who reported the vaping, and Parents asserted that student was "motivated" to accuse B.O. Upon arriving at the office,

---

[4] Parents initially describe the conduct at issue as "putting a roll of toilet paper" on the bathroom floor but later describe Stark's belief that Students had been "throwing" toilet paper.

B.O. admitted having a vape pod but said he had picked it up as trash in the school parking lot.

After these incidents, two of the four parents met with Principal Dr. Lowe and Stark to report that Stark "continued to follow and harass" Students. Stark explained he believed Students had thrown toilet paper because of their laughter as they left the bathroom, but offered no justification for questioning Students in the cafeteria about the incident. Parents also confronted Stark about having observed Students in the bathroom, but Stark "showed no regard" for Students' "discomfort" and did not apologize. In response to Parents' inquiries about why Stark had been permitted to search B.O. before calling his mother,[5] Dr. Lowe explained that he had been out of town on the day of the incident. At this meeting, Parents asked for the "sexual harassment" to stop.

About a month later, a different coach learned Students and others were vaping on campus during a football game. The group was taken to the gym by the coach and a police officer, and questioned and lectured about the dangers of vaping and the disciplinary consequences outlined in the Handbooks. Although the students were not searched, vaping paraphernalia was discovered in the possession of one student.

---

[5] Our record does not disclose any incident during which Students were searched.

Several months later, another teacher questioned a student group that included Students about spraying water in a bathroom using a broken hose. When others in the group suggested Students were responsible for the damage, B.O. admitted to spraying water.

About a week later, Prince of Peace expelled both B.O. and S.R. and wrote each family a detailed letter. Prince of Peace explained it had fully investigated all allegations by Parents regarding unlawful or inappropriate conduct by its employees, including each of Parents' complaints of "ongoing harassment, defamation and bullying," public humiliation, and threats directed at Students by staff. The school wrote that all disciplinary actions it had taken regarding Students were reasonable and conformed to its policies and procedures. Prince of Peace alleged Parents' "aggressive" and "unfounded" accusations were inconsistent with its Lutheran Christian philosophy, its goal of developing good home–school communications in furtherance of a "quality Christian education," and resulted in the school's inability to assist Parents in providing a Christian education for Students. Parents were informed:

> POPCS must be able to effectively communicate and work together with parents in accordance with POPCS' mission "to provide a Christian education program that is centered upon Biblical principles." You have demanded that the administration of the high school not speak to your son or daughter without you present. You have demanded that Assistant Principal Stark not be involved in any investigation and/or meeting with your son. You have required POPCS to communicate with you through attorneys. Your demands contradict the normal operating procedures and philosophies of POPCS. In addition, your

–9–

threats of litigation and negative accusations against school personnel have resulted in both teachers and administrators being unable to perform their duties as it relates to your children and/or appropriately minister to your family. Further, you have publicly portrayed POPCS in a negative manner. Your actions clearly indicate that you can no longer adhere to the policies, philosophies and procedures of the school. As such, POPCS can no longer minister to your family and complete its mission.

Parents filed suit alleging Prince of Peace breached its contract by (1) failing to operate the school in compliance with applicable state laws regarding the supervision and care of children, including by failing to report abuse or neglect which purportedly occurred when Stark sexually harassed Students; and (2) failing to employ qualified faculty to address bullying and harassment by the school's staff. Parents also pleaded a negligence claim premised on Prince of Peace's alleged failure to hire suitable employees and appropriately supervise those employees. Parents sought the value of their lost tuition payments, compensation for Students' mental and physical anguish, and attorneys' fees.

Prince of Peace filed a plea to the jurisdiction, contending judicial resolution was prohibited by the ecclesiastical abstention doctrine. This mandamus proceeding followed the trial court's denial of the plea.

## DISCUSSION

### A. Mandamus standards related to pleas to the jurisdiction

Entitlement to mandamus relief requires a demonstration that the trial court clearly abused its discretion, and the absence of an adequate remedy by appeal. *In re Prudential Ins. Co.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding).

Although an appeal generally provides an adequate remedy for denial of a jurisdictional plea, *In re Godwin*, 293 S.W.3d 742, 747 (Tex. App.—San Antonio 2009, orig. proceeding), where First Amendment rights are at issue an appeal does not suffice. *Tilton v. Marshall,* 925 S.W.2d 672, 682 (Tex. 1996); *In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d 347, 352 (Tex. App.—Dallas 2017, orig. proceeding); *see also Republican Party of Tex. v. Dietz,* 940 S.W.2d 86, 94 (Tex. 1997) (orig. proceeding) ("mandamus jurisdiction may be properly invoked when First Amendment rights are at issue").

**B.      Procedure governing jurisdictional challenges**

A de novo review controls review of a plea to the jurisdiction premised on subject matter jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). If the plea challenges the existence of jurisdictional facts, we employ the same procedure that governs a traditional summary judgment, by which the movant presents evidence demonstrating the absence of jurisdiction, with the burden then shifting to the opposing party to demonstrate a disputed material fact regarding jurisdiction. *Id*. In such circumstance, we necessarily consider evidence beyond the pleadings. *Id.* ("[I]f a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do."); *In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d at 352 ("If a plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court may

–11–

consider evidence beyond the pleadings and must do so when necessary to resolve the jurisdictional issues raised.").

Although we do not decide any merits issues or resolve any questions of fact, if undisputed evidence implicates the merits as well as our jurisdictional inquiry, we must consider it. *Texas Dep't of Parks & Wildlife*, 133 S.W.3d at 226 ("In this case, we address a plea to the jurisdiction in which undisputed evidence implicates both the subject matter jurisdiction of the court and the merits of the case."); *see also Doe v. Archdiocese of Galveston-Houston*, No. 01-18-01056-CV, 2020 WL 3820886, at *6 (Tex. App.—Houston [1st Dist.] July 7, 2020, no pet.) (mem. op.) (relying on school's jurisdictional evidence to demonstrate absence of jurisdiction without accepting truth of same evidence regarding merits of dispute); *Becker v. Clardy*, No. 03-10-00376-CV, 2011 WL 6756999, at *5 (Tex. App.—Austin Dec. 22, 2011, pet. denied) (mem. op.) (relying on undisputed evidence regarding school's resolution of claim against plaintiff in deciding jurisdictional question).

Jurisdiction must exist for each claim. *Thomas v. Long*, 207 S.W.3d 334, 338–39 (Tex. 2006) ("[I]t is proper for a trial court to dismiss claims over which it does not have subject matter jurisdiction but retain claims in the same case over which it has jurisdiction."). Where the same facts govern jurisdiction over different claims, however, we need not address each claim separately. *Shannon v. Mem'l Drive Presbyterian Church U.S.*, 476 S.W.3d 612, 620 (Tex. App.—Houston [14th Dist.]

2015, pet. denied); *see also City of Dallas v. Jones*, No. 05-07-00831-CV, 2008 WL 588997, at \*4 (Tex. App.—Dallas Mar. 5, 2008, pet. denied) (mem. op).

## C.      The ecclesiastical abstention doctrine

Ecclesiastical abstention arises from the Free Exercise Clause of the First Amendment,[6] and prohibits government action that "burdens the free exercise of religion." *Jennison v. Prasifka*, 391 S.W.3d 660, 664-65 (Tex. App.—Dallas 2013, no pet.).    In deciding whether ecclesiastical abstention applies, we look to the substance and effect of a plaintiff's complaint to determine its "ecclesiastical implication not its emblemata." *Shannon*, 476 S.W.3d at 622; *In re Vida*, No. 04-14-00636-CV, 2015 WL 82717, at \*2 (Tex. App.—San Antonio Jan. 7, 2015, orig. proceeding) (mem. op.) ("[I]n deciding whether a court should refrain from exercising jurisdiction under the doctrine, courts must consider the substance and nature of the claim ***and*** the effect of a judicial resolution." emphasis original)). "[W]hether a judicial resolution will encroach on the institution's governance and affairs" frames the "key inquiry." *In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d at 356.    Even if secular principles define and provide the elements of the claims asserted, determining civil liability may nonetheless impermissibly infringe on a faith-based organization's right to "construe and administer church doctrine."

---

[6] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. CONST. amend. I.

*Becker*, 2011 WL 6756999, at \*3 (quoting *Pleasant Glade Assembly of God v. Shubert*, 264 S.W.3d 1, 10 (Tex. 2008)).

If otherwise applicable, religious organizations, including schools whose operation or curriculum depend on faith-based principles, fall within the doctrine's protection. *In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d at 357 (Although school was undisputedly not a church, "the record establishes that it is nonetheless a faith-based institution enjoying First Amendment protection for the free exercise of religion." internal quote omitted)); *In re St. Thomas High Sch.*, 495 S.W.3d 500, 508 (Tex. App.—Houston [14th Dist.] 2016, orig. proceeding) (rejecting contention that Catholic school, which was neither a church, nor owned by a church, was exempt from ecclesiastical abstention doctrine, because record demonstrated school's purpose involved "substantial religious activity and purpose"); *Patterson v. Sw. Baptist Theological Seminary*, 858 S.W.2d 602, 605–06 (Tex. App.—Fort Worth 1993, no writ) (dismissing wrongful termination suit against Baptist seminary not owned or operated by church); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 182 (2012) (applying ecclesiastical abstention to religious school, and describing the doctrine's reach as prohibiting interference with decisions of "religious groups").

## D. Ecclesiastical abstention precludes jurisdiction over Parents' claims

Parents allege the doctrine has no application because (1) Prince of Peace is not a faith-based entity; and (2) Parents' claims do not rely on Students' or any

–14–

"employee's adherence to religious standards or morals, or the implementation of religious beliefs." Parents fail to raise a genuine question of material fact regarding either argument.

### 1. Prince of Peace is a faith-based entity

Parents contend Prince of Peace's legally separate existence from the Lutheran Church, as well as its secular focus on a quality education, diversity, and its adherence to secular laws and accreditations, distinguish it from other "religious entities." We observe, however, no meaningful distinction between Prince of Peace and any other school or entity which we or our sister courts have determined qualified as "faith-based" entities entitled to ecclesiastical abstention. *See In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d at 355–56 (facts demonstrated "that the school endeavors to imbue its students and staff with Christian principles and values even if those persons do not already subscribe to them"); *In re St. Thomas High Sch.*, 495 S.W.3d at 509–10 (Biblically–based mission, students' mandated participation in church-related services and activities, and faith-based curriculum demonstrated school was a religious institution). That Prince of Peace *also* subjects itself to secular accreditation and strives to achieve metrics unrelated to religion, in no way diminishes the extensive evidence demonstrating its reliance on Biblical principles, Biblical doctrine, and faith-based measures guiding its operation and the education it seeks to provide. Parents failed to raise a question of fact regarding Prince of

–15–

Peace's qualification as a faith-based entity entitled to invoke the protection of ecclesiastical abstention.

### 2. Ecclesiastical abstention precludes interference with a religious entity's management of its internal affairs

Parents assert their claims rest on secular duties and do not require evaluation of any religious doctrine or belief for resolution. Parents contend the claims are governed by general laws regarding reporting child abuse and contractual enforcement regarding the school's promises to employ "faculty who, at minimum, refrain from harming students in their care, and its obligation to appropriately supervise employees so that they do not harass students without violating the principles of the First Amendment." Parents also endeavor to distinguish four cases in which Texas appellate courts have applied ecclesiastical abstention to claims asserted against religious schools,[7] and one between teachers at such a school.[8] Neither argument persuades us.

### a. Judicial resolution would require interference with Prince of Peace's internal affairs

Parents first argue that unlike *Becker* and *Archdiocese of Galveston-Houston*, their claims are not premised on "violations of internal policies," and are instead

---

[7] *Archdiocese of Galveston-Houston*, 2020 WL 3820886, at *5; *In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d at 357; *In re St. Thomas High Sch.*, 495 S.W.3d at 509; *In re Vida*, 2015 WL 82717, at *3.

[8] *Becker*, 2011 WL 6756999, at *5.

grounded solely on secular obligations. Even if the argument correctly characterized Parents' claims,[9] however, we would reject it.

Application of ecclesiastical abstention does not require that Parents' claims expressly depend on any Biblical principle, interpretation of Prince of Peace's policies, or include an overt request for interference with Prince of Peace's internal affairs. *Shannon*, 476 S.W.3d at 622 (substance and effect of a plaintiff's complaint, rather than specific claims or support, inform evaluation of abstention). Resulting interference in internal affairs as the effect of judicially resolving a claim, even those not clearly grounded in a religious doctrine, requires abstention. *Westbrook v. Penley*, 231 S.W.3d 389, 395 (Tex. 2007) ("Government action may burden the free exercise of religion in two quite different ways: by interfering with an individual's observance or practice of a particular faith . . . and by encroaching on the church's ability to manage its internal affairs." internal quotation and citation omitted)); *Archdiocese of Galveston-Houston*, 2020 WL 3820886, at *5 ("The key inquiry is whether a judicial resolution will encroach on the institution's governance and affairs."); *In re Vida*, 2015 WL 82717, at *3 (application of doctrine turns on "effect of judicial resolution," not just "nature of the claims" asserted); *see also Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) ("The independence of religious institutions in matters of 'faith and doctrine' is closely

---

[9] Parents allege Prince of Peace's handbook and related materials promise a "certain educational environment," "faculty who are expected to serve as role models," recognize that "harassment and bullying negatively impact [students'] well-being and safety," and include "set rules about behavior and discipline."

–17–

linked to independence in what we have termed 'matters of church government.'") internal quotation omitted)).

Moreover, Parents' efforts to frame the dispute as reliant only on secular duties ignores Prince of Peace's controverting but undisputed jurisdictional evidence. We cannot divorce Parents' contentions of abuse, harassment, and failure to report abuse, from Prince of Peace's supervision and discipline of Students, its investigation of Parents' complaints, and its ultimate expulsion of Students and their families. Resolution of Parents' claims will require a trial court or jury to determine whether Prince of Peace's policies, investigation, management of student and staff conduct, and employment and enrollment decisions satisfied contractual and common law duties regarding Students' education and psychological well-being. Ecclesiastical abstention prohibits that judicial interference. *See Archdiocese of Galveston-Houston*, 2020 WL 3820886, at *5 (dismissing claims premised on school's discipline process following family's complaints that teacher bullied, harassed and abused young child); *In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d at 357 (dismissing claims premised on school's discipline of student who smoked marijuana, used another student's urine for drug test, etc.); *In re St. Thomas High Sch.*, 495 S.W.3d at 509 (dismissing claims premised on school's expulsion of family where parents characterized grading dispute and teachers' failure to return parent's call as sexual harassment); *In re Vida*, 2015 WL 82717, at *3 (dismissing claims premised on school's refusal to promote five year–old to first grade in

violation of its policy); *Becker,* 2011 WL 6756999, at *5 (dismissing libel and slander claims asserted by one teacher against another, premised in part, on school's investigation and decision not to impose any discipline on defendant teacher, despite plaintiff's decision to not sue school and her contention that school's discipline was not challenged).

The facts at issue in *St. Thomas High School* are particularly close. In that case, after a student and his teacher were unable to resolve a dispute about a grade, the student's parents complained to the school. The parents accused two faculty members of "intimidating and harassing the student in response to legitimate concerns regarding testing procedures" and alleged one teacher had engaged in sexual harassment by telling the student the teacher did not return the student's after-school call because the teacher was preparing for a romantic evening celebrating his wedding anniversary. 495 S.W.3d at 503. The parents also alleged the teachers' behavior violated the school's goals in spiritually educating their son and demanded the school investigate "willful abuses of power and harassment" of their child. *Id.*

Upon concluding its investigation and determining the parents' accusations were baseless, the school also determined the parents' behavior violated the school's handbook in which the school outlined insults, threats, and abuses of teachers by parents as grounds for a student's expulsion. *Id.* at 504. The parents sued and sought an injunction compelling their child's re-enrollment. In response to the school's plea to the jurisdiction, the parents argued neutral legal principles would govern their

breach of contract claim, that asserted St. Thomas failed to provide the education promised. *Id.* at 509. The court rejected the argument because application of ecclesiastical abstention does not focus on the presence or absence of an express dispute concerning religious doctrine. *Id.* Instead, the court concluded "spiritual standards and religious doctrine" permeated the school's decision to expel the students, as well as the quality and type of education parents sought for their children, and governmental action would encroach on the school's ability to manage its internal affairs. *Id.* at 510, 513. The parallels between *St. Thomas* and this dispute are compelling.

We also reject Parents' efforts to limit *St. Thomas*' holding through their argument that since their claims forgo any reliance on expulsion or re-enrollment, their claims do not implicate membership in a religious organization. The argument ignores undisputed jurisdictional facts that Students' expulsion precipitated this lawsuit and implicitly elevates one type of interference to the *only* type of interference justifying abstention. In making this argument, Parents seek to distinguish *Archdiocese of Galveston-Houston,* 2020 WL 3820886, and *Episcopal School of Dallas,* 556 S.W.3d at 347, and similarly assert that based on the focus on "enrollment or retention," their claims are unlike those in *St. Thomas High School*, 495 S.W.3d at 500, and *Vida,* 2015 WL 82717, at *3. But the reasons for the school's actions in each case—its internal discipline and management of its affairs—rather than the result of that discipline warranted application of the doctrine. *Archdiocese*

*of Galveston-Houston*, 2020 WL 3820886, at \*6; *In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d at 359 ("[R]esolving those [parents'] claims would require a court to pass judgment on the school's internal affairs and governance—matters exclusively within the province of an ecclesiastical institution."); *In re St. Thomas High Sch.*, 495 S.W.3d at 509–10 ("[P]laintiffs' exclusive focus on the presence or absence of an express dispute concerning religious doctrine demonstrates an unduly narrow conception of the applicable protections."); *In re Vida*, 2015 WL 82717, at \*3 ("[E]ven if the School's age requirement was not *required by* Texas law, imposing civil tort liability on the superintendent of Catholic schools for enforcing a policy that established an age requirement would impinge upon the Diocese's ability to manage its internal affairs by adopting policies regarding admission requirements for Catholic schools." emphasis original)). The absence of an additional interference that would result from efforts to compel re-enrollment in no way diminishes the interference from judicial evaluation of efforts to hire, supervise, and discipline teachers and students in a manner Parents deem compliant with the school's promises regarding Students' education.

We identify no meaningful distinction between any of these "school cases" and the one before us now. We conclude that, as in each of these preceding cases, ecclesiastical abstention prohibits judicial intervention in the dispute at hand.

### b. Cases evaluating intentional torts, physical injuries, or claims which explicitly exclude the basis for abstention provide no support for Parents

By our decision today we do not diminish any person's obligation to report suspected abuse or imply that abstention would ever interfere with enforcement of a law requiring such reports by those vested with the duty and authority to enforce it.[10] An obligation to report an injury to a child cannot depend on whether faith-based principles inform the suspicions of the person alerted to potential abuse, or whether a criminal complaint premised on Family Code section 261.101 would otherwise interfere with First Amendment rights. *See* Op. Tex. Att'y Gen. No. JM-342 (1985) (requiring clergyman to report evidence of child abuse or neglect disclosed confidentially by parishioner does not violate Free Exercise Clause, because "[t]he freedom to believe is absolute, but the freedom to act is conduct subject to regulation for the protection of society.").

But here, Parents are asserting a breach of contract claim premised on the frequency, intrusiveness, and proximity of school administrators' supervision in or near a restroom, and a school's investigation regarding complaints about that supervision. Regardless of how Parents characterize the conduct about which they

---

[10] Although our decision today does not assess the merits of Parents' claims, we question the existence of any breach of contract claim premised on failure to report abuse as required by Family Code § 261.101, because we see no causation between any alleged injury and the failure to report the conduct about which Parents complain, and because the statute creates no private cause of action. *Perry v. S.N.*, 973 S.W.2d 301, 306 (Tex. 1998) (rejecting Family Code § 261.101 as creating a duty in tort); *Doe v. Apostolic Assembly of Faith in Christ Jesus*, No. EP-19-CV-240-KC, 2020 WL 1684227, at *14 (W.D. Tex. Apr. 6, 2020) (*Perry* court rejected Family Code § 261.101 as creating duty and standard, "in any context" other than as a potential crime).

–22–

complain, we are not presented with intentional torts, physical injuries, or crimes. Neither do the undisputed facts present threats to public health, safety, or general welfare, which are intolerable even if otherwise protected as a religious belief. *Pleasant Glade Assembly of God*, 264 S.W.3d at 12; *Tilton*, 925 S.W.2d at 677 (ecclesiastical abstention will not apply to actions which violate social duties or are "subversive of good order.") (quoting TEX. CONST. art. I, § 6 interp. commentary (Vernon 1984)); *see also Westbrook*, 231 S.W.3d at 404 ("Neither was his revelation an intentional tort that endangered Penley's or the public's health or safety."); *Becker*, 2011 WL 6756999, at *5 ("[I]n determining whether the Doctrine applies to tort claims, the courts distinguish intentional torts that endanger public health and safety and that cause physical harm from torts that only cause intangible or emotional harms."). Accordingly, our decision here does not speak to instances in which those facts exist. Likewise, we decline Parents' invitation to equate the allegations here with those in *Doe I v. Roman Catholic Diocese of Galveston-Houston*, No. CV H-05-1047, 2006 WL 8446968, at *9 (S.D. Tex. Mar. 27, 2006),[11] or cases in which

---

[11] Claims against the church rested upon allegations that the "Archdiocese Defendants negligently: (1) investigated, hired, supervised, reassigned, and retained clerics known to have abused minors; (2) failed to warn parishioners that a cleric assigned to their parishes could be a threat to their children; (3) ignored warnings from medical professionals retained by various Church officials and organizations, directly or indirectly, that certain clerics posed a danger to children; (4) lied to victims who asked for information about abusers; (5) failed to provide medical professionals evaluating abusers who were clerics with the necessary facts and, in some cases, lying to the medical professionals about the clerics' background or concealing material facts; (6) ignored warnings from others within the church and bishop's conference who warned that certain clerics posed a threat to children; (7) failed to report the crimes committed by certain clerics to law enforcement and obstructed or interfering with law enforcement investigations concerning abusive clerics; (8) failed to alert members of parishes where abusive clerics had previously served that their children were exposed to known or suspected child molesters; (9) made decisions that valued the

–23–

facts similar to *Doe I* are at issue.  We also observe that other courts have applied abstention in the face of the same or similar claims as those raised by Parents where neither intentional conduct nor physical harm was alleged. *Archdiocese of Galveston-Houston*, 2020 WL 3820886, at \*3 (dismissing claim that family's expulsion was "an effort to conceal abuse"); *In re Pleasant Glade Assembly of God*, 991 S.W.2d 85, 89 (Tex. App.—Fort Worth 1993, no writ) (applying ecclesiastical abstention to negligence per se claim premised on violation of Family Code chapter 261).

Finally, cases in which the conduct at issue rested on a relationship outside of the one between the religious entity and the plaintiff fail to defeat application of abstention here.  For instance, in both *Hawkins v. Trinity Baptist Church*, 30 S.W.3d 446, 451–52 (Tex. App.—Tyler 2000, no pet.), and *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 337–38 (5th Cir. 1998), the complained of conduct occurred in the context of marital counseling, which thus gave rise to a relationship and duties outside of the protected relationship between the church and its members.

---

interests of abusive clerics and the Church's desire to avoid scandal over the interests of children who had been abused by clerics; (10) used Church influence to alter the outcome of the criminal legal process relating to clerics who engaged in illegal sexual acts; (11) fostered an environment and culture that allowed child abuse to flourish and made it clear that there was no accountability for criminal sexual acts against children; (12) negligently destroyed documents about clerics' child sexual abuse or illegally withheld them from authorities, victims' families, and the public; and (13) failed to warn Church members about facts such as the 'Beal deposition,' 'i.e., that priests have been 'hitting' on penitents, including children, since the inception of the private confession-box in the sixteenth century.'" *Roman Catholic Diocese of Galveston-Houston*, 2006 WL 8446968, at \*9.

–24–

Moreover, in *Hawkins*, the church's potential liability arose from violations of the Sexual Exploitation by Mental Health Services Provider Act[12] through the church's negligent hiring or supervision of the minister whose conduct was at issue. *Hawkins*, 30 S.W.3d at 453. That statute expressly defined the minister's challenged conduct as *not* including activities protected by the ecclesiastical abstention doctrine. TEX. CIV. PRAC. & REM. CODE § 81.001(7) ("'Mental health services,' as defined by this section, provided by a member of the clergy does not include religious, moral, and spiritual counseling, teaching, and instruction."). The inquiry excluded by the statute—whether inquiry into Prince of Peace's internal practices or religious beliefs with respect to its hiring and supervision of its administrators—is the precise question at issue here. Thus, these authorities lend no support to Parents' position.

## CONCLUSION

Parents' claims are premised on allegations that Prince of Peace failed to hire qualified staff and appropriately supervise its staff's interactions with Students, including by failing to report suspected abuse of Students by its staff. Defense of these claims rests on Prince of Peace's internal and religiously-informed policies and code of conduct. Judicial resolution of the claims would thus require impermissible intrusion in Prince of Peace's management of these matters.

---

[12] TEX. CIV. PRAC. & REM. CODE §§ 81.001–81.009.

Accordingly, we conditionally grant mandamus relief. The writ will issue only if respondent fails to grant Prince of Peace's plea to the jurisdiction.

/Robert D. Burns, III/
ROBERT D. BURNS, III
CHIEF JUSTICE

200680F.P05